617 P.2d 30

Philip J. RUSSO and Karen Russo, his wife, Plaintiffs–Appellants,

v.

Edward B. DIETHRICH, M. D., Robert Payne, M. D., Samuel A. Kinard, M. D., Defendants–Appellees.

No. 1 CA–CIV 4642.

Court of Appeals of Arizona, Division 1, Department C.

July 29, 1980.

Rehearing Denied Sept. 9, 1980.

Review Denied Sept. 30, 1980.

Norman Herring, Phoenix, for plaintiffs–appellants.

Martori, Meyer, Hendricks & Victor by Edwin F. Hendricks, R. Douglas Dalton, Andrew D. Hurwitz, Phoenix, for defendants–appellees.

## OPINION

JACOBSON, Judge.

The sole issue raised in this appeal of a medical malpractice case is whether the plaintiff knew or should have known of the alleged malpractice more than two years prior to filing his action so as to be barred by the applicable statute of limitations.

This tort action, based upon medical malpractice, was filed on November 7, 1975 by the plaintiffs, Philip J. Russo and Karen Russo, his wife, against defendants Edward

B. Diethrich, M.D., Robert Payne, M.D., and Samuel A. Kinard, M.D. The malpractice alleged was that on August 2, 1972, the medical doctors comprising the Arizona Heart Institute (AHI), a department of St. Joseph's Hospital and Medical Center in Phoenix, Arizona, performed unnecessary coronary bypass surgery on the plaintiff, Philip Russo (Russo). Following extensive discovery, the defendants moved for summary judgment on the basis that plaintiffs' action was barred by the applicable statute of limitations, A.R.S. § 12–542(B). This statute, at the time the action was filed, provided in pertinent part:

A cause of action for injury or death against a physician or surgeon . . . based upon . . . professional negligence . . . shall accrue as of the date of injury and shall be commenced and prosecuted within . . . *two years* after the injured party discoveres or through the use of reasonable diligence should have discovered the malpractice . . . . These time limitations shall be tolled for any period during which such person has failed to disclose any act, error or omission upon which such action is based and which through the use of reasonable diligence should have been known to him.

(Emphasis added.)

The trial court granted defendants' motion for summary judgment and plaintiffs have appealed.

On appeal, the plaintiffs raised the following issues:

(1) That an issue of fact exists as to whether Philip Russo knew or through the exercise of reasonable diligence should have known of the alleged malpractice of the defendants more than two years prior to filing his complaint;

(2) That the defendants knew that the surgery was unnecessary and their failure to so inform the plaintiffs tolled the statute of limitations;

(3) That the applicable statute of limitations in this case is the three year statute for fraud; and

(4) That the continuing patient–physician relationship tolls the statute of limitations.

The facts are as follows. In May of 1972, Russo suffered a myocardial infarction in Medina, New York, and was treated by Dr. John P. Fernandez, a cardiologist. Following this heart attack, Russo suffered severe chest pains and as a consequence, in the latter part of July, 1972, was admitted to AHI in Phoenix for evaluation.

At AHI, Russo underwent various testing, including a cardiac catheterization performed on July 26, 1972. A cardiac catheterization is a process by which dye is injected into the arteries in the region of the heart and the physician can then visually follow the flow of blood in the arteries and into the heart. Films are taken of this process consisting of cines and spot films (Polaroid photos). The catheterization revealed that Mr. Russo suffered from an essentially completely occluded (blocked) right coronary artery and thus blood was not adequately flowing to the portion of the heart supplied by that artery.

Based upon the various tests, including the catheterization, Dr. Diethrich, Chief of Cardiovascular Surgery at AHI, recommended to Russo that he undergo surgery consisting of a bypass graft around the occluded portion of the right coronary artery. This operation, if successful, would restore the flow of blood to that portion of the heart. Russo testified that he was told by Dr. Diethrich that if the operation was *not performed, he would die.* Apparently, the recommendation for surgery was the result of a consultation between Dr. Diethrich, Dr. Payne and Dr. Kinard.

The surgery was performed on August 2, 1972, and Russo was released two weeks later. He was readmitted to St. Joseph's on two occasions in October, 1972 for pain as a result of "post–cardiotomy syndrome" (agitated depression). In late October, 1972, Russo returned to New York and again came under the care of his cardiologist, Dr. Fernandez.

Following his surgery, Russo complained of disabling pain on a daily basis and as a result he was hospitalized on several occa-

sions in New York. In connection with Dr. Fernandez' continuing treatment of Russo, he, on or about November 1, 1972, obtained the AHI report of the July 26, 1972 catheterization performed on Russo. According to Dr. Fernandez, this report showed a complete occlusion of Russo's right coronary artery. It was Dr. Fernandez' opinion that if the catheterization report was correct, and the right coronary artery was totally occluded, it meant the heart muscle which would have been served by that artery was already so destroyed that to bypass the occluded artery into the dead muscle would serve no useful purpose.

In order to verify the suspicion raised by the catheterization report, Dr. Fernandez on April 6, 1973, wrote to AHI and requested the films taken in connection with the catheterization. Approximately two weeks later, he received the "spot films" taken on July 26, 1972 which seemed to confirm the total occlusion of the right coronary artery. In early July, 1973, Dr. Fernandez took the films and report to a cardiovascular conference in Rochester, New York. Without revealing that the patient had already received surgery, Dr. Fernandez requested an opinion as to the necessity for surgery. Dr. Fernandez testified that the result of this presentation was that the cardiovascular conference felt surgery was not recommended.

Approximately two weeks later, Dr. Fernandez told Russo that he suspected the bypass surgery had not been necessary. Russo's counsel, before the trial court, conceded that this advice was given in "late July or early August, 1973."

Dr. Fernandez, in an affidavit filed in the trial court explaining his depositional testimony concerning the advice given to Russo, stated:

> I told Mr. Russo that I did not think that the surgery had done anything to him which would be responsible for the pain. I also thought that the bypass surgery had not been of any benefit to him, but that there was a possibility that the bypass graft had remained patent [open]. This patency or occlusion of the bypass

graft could only be proved, one way or the other, by another cardiac catheterization.

While Dr. Fernandez recommended that Russo undergo another catheterization, this advice was not followed until February 18, 1974, when in response to a standard follow-up notice from AHI that a catheterization be performed to ascertain the status of the bypass graft, Russo returned to AHI for this procedure. The follow-up catheterization showed the bypass surgery was unsuccessful and that the bypass graft was also occluded. This action was filed on November 7, 1975.

Russo first contends, under these facts, that a triable issue of fact remains as to whether prior to November 7, 1973 (two years prior to filing his complaint), he knew or should have known that an alleged malpractice consisting of unnecessary surgery had been committed.

The first argument in support of this contention is that malpractice is not committed until a harm or injury results to the patient and that Russo was not aware of any harm or injury until February, 1974, when the follow-up catheterization proved that the bypass graft was unsuccessful. From this premise, he argues that his cause of action did not accrue until that date.

█ We reject the February, 1974, date based upon this reasoning out of hand. Russo is not contending that the surgery was negligently performed, resulting in an unsuccessful operation. Rather, he is contending that the surgery itself was completely unnecessary. If this allegation be true, the harm or injury he suffered occurred when he went under the surgeon's knife on August 2, 1972, not on February 18, 1974 when he learned of the ultimate consequences of that surgery. The question then becomes when did he know or when should he have known that surgery was unnecessary, not whether it was successful.

Russo next contends that the opinion and advice offered by Dr. Fernandez in late July or early August, 1973, that the surgery was unnecessary, was not such that it oper-

ated to invoke the running of the statute of limitations. This is a more difficult question and its answer requires a careful analysis of what Dr. Fernandez told Russo.

Russo contends that this advice was that Dr. Fernandez had strong suspicions that the area to which the bypass graft was to supply blood was already dead (scar tissue) and the bypass would serve no useful purpose, but to verify this suspicion, another catheterization was necessary. Unfortunately, this argument is couched in terms of using the subsequent catheterization to determine if "the bypass had been unsuccessful (and therefore unnecessary)." The defendants correctly point out that whether the bypass was successful or not is immaterial to whether the surgery was deemed to be a necessary procedure in the first instance. Dr. Fernandez readily admitted that many bypass operations which are medically recommended have an unsuccessful result.

However, as we read Dr. Fernandez' testimony (and especially his affidavit explaining his depositional testimony), we are not prepared to say, as urged by the defendants, that Dr. Fernandez unequivocally told Russo the surgery was unnecessary without a confirming post–surgery catheterization. Having read and reread Dr. Fernandez' testimony and affidavit on this point, we conclude that at least a reasonable interpretation of that testimony is that Dr. Fernandez needed a post–surgery catheterization, not to confirm his opinion that the bypass was occluded, but to see if the bypass was patent (open) and functioning, thus casting serious doubts on his opinion that the surgery was unnecessary. If this is in fact what Dr. Fernandez told Russo, or if a trier of fact could determine this was what was conveyed, then a disputed issue of fact is presented as to whether Russo knew or should have known at that time that a cause of action existed for unnecessary surgery.

This interpretation of Dr. Fernandez' advice to Russo raises a second question, that is, did Russo use "due diligence" to discover the confirmatory evidence (post–surgery catheterization) needed by Dr. Fernandez to solidify his unnecessary surgery opinion. If we take August 1, 1973 as the date Dr. Fernandez told Russo that a subsequent catheterization was necessary to confirm his opinion, this procedure was not undertaken until February 18, 1974, some six and one–half months later and then only through the apparent fortuitous circumstance of a routine checkup by AHI. However, given the seriousness of the catheterization procedure, we are not prepared to say, as a matter of law, that Russo lacked due diligence in pursuing this evidence.

■ Because this issue was disposed of by summary judgment, our conclusion that disputed issues of fact surround its resolution requires the summary disposition to be reversed.

Since the issue of whether the statute of limitations is applicable in this case must be tried, *see Landgraff v. Wagner*, 26 Ariz. App. 49, 546 P.2d 26 (1976), we deem it appropriate to discuss the remaining contentions on this issue so as to narrow that inquiry upon trial.

■ Russo argues that because the defendant–doctors did not, subsequent to the surgery, disclose to him that surgery was unnecessary, under the last sentence of A.R.S. § 12–542(B) the statute of limitations was tolled. What Russo is suggesting is that the fact of whether the statute has been tolled must await the determination by a trier of fact as to whether malpractice occurred. Under this interpretation, if the trier of fact ultimately determines that malpractice occurred, and the attending physician failed to disclose this regardless of any follow–up treatment which would allow the physician to discover his malpractice, the statute of limitations would never begin to run. Such an interpretation was rejected in *Landgraff v. Wagner, supra*, which held that the tolling provisions of A.R.S. § 12–542(B) only come into effect where in the course of events following the alleged malpractice, the physician comes into possession of information which would make the malpractice apparent and thereafter does not disclose this to the patient.

Under this interpretation and under the facts here, the tolling provisions of A.R.S. § 12–542(B) are not applicable.

Next Russo urges that Dr. Dietrich's alleged statement that if Russo did not have the contemplated bypass surgery he would die was fraudulent and therefore his cause of action should be based upon the statute of limitations applicable to fraud (3 years), A.R.S. § 12–543. The simple answer to this is that Russo's cause of action is not for fraud, nor has fraud been pled in any pleadings before the trial court with the particularity required by Rule 9(b), Arizona Rules of Civil Procedure.

Russo chose what form his cause of action would take (medical malpractice), he may not now before this court attempt to change that form in order to secure a longer statute of limitations.

Finally, Russo argues that Arizona should adopt a rule applicable to the statute of limitations on medical malpractice that as long as the physician–patient relationship exists, the statute of limitations would be tolled. It appears that Arizona has rejected such a tolling provision. *Morrison v. Acton*, 68 Ariz. 27, 198 P.2d 590 (1948); *Acton v. Morrison*, 62 Ariz. 139, 155 P.2d 782 (1945).

Moreover, even in those states recognizing a tolling period based upon the physician–patient relationship, *continuity* of treatment is required to bring the principle into play. Here, AHI's treatment of Russo basically ended when he was released from the hospital in October, 1972. The only other contact with Russo was the routine follow–up approximately one and one half years later. During the interim, Russo's treatment and care passed to other physicians. There is simply no continuity of treatment present here to make the tolling principle urged applicable, even if recognized.

For the reasons previously stated, the judgment in favor of the defendants is reversed and the matter remanded for further proceedings.

CONTRERAS, P. J., and OGG, C. J., concur.