IN THE SUPREME COURT OF THE STATE OF ARIZONA
En Banc

| | | |
|---|---|---|
| JIMMYE WALK, a single person, | ) | Arizona Supreme Court |
| | ) | No. CV-01-0090-PR |
| Plaintiff-Appellant, | ) | |
| | ) | Court of Appeals |
| v. | ) | Division One |
| | ) | No. 1 CA-CV 00-0233 |
| DALE J. RING, D.D.S. and CHRISTINE L. | ) | |
| RING, husband and wife; DALE J. RING, | ) | Yavapai County Superior Court |
| D.D.S., LTD., a limited partnership, | ) | No. CV 97-0596 |
| | ) | |
| Defendants-Appellees. | ) | **O P I N I O N** |
| | ) | |

On Appeal from the Superior Court in Yavapai County
The Honorable William T. Kiger, Judge
REVERSED AND REMANDED

Memorandum Decision of the Court of Appeals, Division One
filed February 8, 2001
VACATED

Plattner Verderame, P.C.                                                          Phoenix
        By:     Richard S. Plattner
Attorneys for Plaintiff-Appellant

Jennings Strouss & Salmon, P.L.C.                                            Phoenix
        By:     Frederick M. Cummings
                    (formerly with White & Cummings, P.C.)
                David B. Earl
Attorneys for Defendants-Appellees

FELDMAN, Justice

¶1        This is another in the long line of claimed professional negligence cases in which our courts have examined the manner in which the discovery rule and constructive fraud theories apply to toll the statute of limitations.

¶2        Jimmye Walk (Plaintiff) brought an action against Dr. Dale J. Ring (Defendant) for dental malpractice in 1997.  The trial judge granted summary judgment to Defendant on the basis of the statute of limitations, and the court of appeals affirmed.  *See Walk v. Ring*, No. 1 CA-CV 00-0233 (filed Feb. 8, 2001) (mem. dec.).  We granted review to examine and reconcile Arizona's cases applying discovery and fraud theories to the statute of limitations for claims of professional or fiduciary negligence.  We have jurisdiction under article VI, § 5(5) of the Arizona Constitution.


**FACTS**

¶3        We are required to view the facts and all legitimate inferences in the light most favorable to Plaintiff, the party against whom summary judgment was granted.  *Orme School v. Reeves*, 166 Ariz. 301, 802 P.2d 1000 (1990).

¶4        Plaintiff consulted Defendant, a dentist practicing in Prescott.  Defendant ultimately recommended a full-mouth reconstruction, which involved grinding down and crowning all of Plaintiff's teeth.  The reconstruction work began in 1991 and took several months, with different sections of teeth being worked on at different times.  Plaintiff previously suffered from a type of temporomandibular joint (TMJ) problem.  Defendant was aware of this before starting his work and sent Plaintiff to Doctor Hodges for evaluation.  Doctor Hodges examined Plaintiff and concluded that her TMJ problems were not causing any significant pain prior to the start of Defendant's reconstruction procedures.  However, shortly after Defendant began his grinding and crowning work, Plaintiff began to suffer from pain in her jaw; she reported significant TMJ pain to Defendant in October 1991, following an eleven-hour reconstruction session.

¶5 From late 1991 through fall 1992, Defendant not only consulted with Doctor Hodges about the TMJ problem but made numerous adjustments in an effort to relieve Plaintiff's pain, including removal and replacement of crowns and adjusting the splint. The pain did not subside, and by late 1993 Defendant was no longer proceeding with reconstruction. Instead, he was working with Doctor Hodges to adjust Plaintiff's bite in an attempt to resolve her TMJ problems, which by now had become severe, requiring administration of narcotics and other palliative efforts.

¶6 In October 1993, Defendant referred Plaintiff to Doctor McDonald, a Phoenix dentist whose practice emphasized the treatment of TMJ problems and reconstruction work. The history taken by Doctor McDonald indicated that Plaintiff's head and neck pain had commenced with Defendant's reconstruction work. In June 1994, Defendant evidently concluded that he was unable to help Plaintiff. He told her that because the outcome of the reconstruction work was not what he had hoped or expected or what Plaintiff deserved, he was referring her to Doctor McDonald and would pay for McDonald's treatment. A confirming note in Defendant's chart, dated June 28, 1994, reads as follows:

> Told [Plaintiff] that I needed to refer her to Jim McD. if he will accept this case. I'd certainly pay for the treatment, *not because I did anything wrong*, but rather that the outcome was not as I had expected or what she deserved. She said she didn't think I did anything wrong but it had been a learning experience we don't want to repeat.

(Emphasis added.)

¶7 Doctor McDonald's notes indicate that he took over Plaintiff's TMJ treatment in August 1994 at Defendant's expense because Defendant essentially "threw up his hands" and no longer knew how to help Plaintiff. After August 1994, Defendant saw Plaintiff primarily for routine maintenance, such as examinations and cleanings; he left the bulk of her TMJ treatment to Doctor McDonald while continuing to perform minor adjustments and writing prescriptions for pain medication.

¶8 Sometime after the initial 1993 referral, Doctor McDonald concluded that the TMJ problems were attributable to Defendant's reconstruction work, specifically to the fact that the crowns inserted by Defendant were too long and had too steep an angle for occlusion, with the result that Plaintiff's jaw was mispositioned. Defendant, in fact, referred the matter to his insurance carrier in 1996.

Doctor McDonald wrote the carrier after that, stating that Defendant's reconstruction and techniques were "contraindicated for someone with a TMD[1] condition," that he had spoken to Defendant, and that Defendant "understands that he was at fault."

¶9 Plaintiff was not told of this and claims she continued to believe that while the TMJ problems she was experiencing presumably were the result of Defendant's reconstruction work, the condition was simply an untoward result not attributable to any fault of Defendant. Plaintiff learned of Doctor McDonald's assessment in 1996, however, consulted an attorney, and filed a malpractice complaint against Defendant in 1997, well within two years of her discovery that McDonald believed Defendant had been at fault.

¶10 Defendant moved for summary judgment on the grounds that the two-year statute of limitations barred Plaintiff's claim. *See* A.R.S. § 12-542.[2] The trial judge granted this motion, and the court of appeals affirmed. We granted review to examine application of the discovery rule to this set of facts and to situations in which a patient is aware that she has been injured during the course of a physician's treatment but unaware that the injury is attributable to the physician's fault or neglect. We find considerable uncertainty, if not confusion, in the Arizona cases attempting to deal with such questions and believe the issue should be resolved. *See* Rule 23(c)(3), Ariz.R.Civ.App.P.

---

[1] Defendant argues that there is a distinction between TMJ and TMD (temporomandibular disorder). However, according to a recognized text representing the standard of care for the treatment of temporomandibular disorders and orofacial pain, "Temporomandibular disorders is a collective term embracing a number of clinical problems that involve the masticatory musculature, the TMJ and associated structures, or both." The American Academy of Orofacial Pain, OROFACIAL PAIN: GUIDELINES FOR ASSESSMENT, DIAGNOSIS, AND MANAGEMENT 116 (Jeffrey P. Okeson, D.M.D., ed. 1996). At this point, and on this record, any distinction between TMJ and TMD appears unimportant, if not irrelevant.

[2] The text of A.R.S. § 12-542 reads in pertinent part as follows:

> Except as provided in § 12-551 there shall be commenced and prosecuted within two years after the cause of action accrues, and not afterward, the following actions:
>
> 1. For injuries done to the person of another including causes of action for medical malpractice as defined in § 12-561.

4

**DISCUSSION**

¶11        Plaintiff claims she was entitled to have a jury decide the disputed facts or draw the disputed inferences "as to when she discovered (knew or should have known) sufficient facts which caused her [claim] to accrue." Petition for Review at 1. She also contends that Defendant concealed the real cause of her problems and the statute was thereby tolled because of constructive fraud or fraudulent concealment. Finally, she argues that Arizona should adopt the continuing treatment rule, which tolls the statute of limitations while the patient continues to receive care from the physician.

¶12        Defendant contends, on the other hand, that it is the knowledge of injury that triggers accrual of the cause of action and running of the statute of limitations and that Plaintiff's "actual failure to comprehend that a potential claim exists will not prevent the accrual of the cause of action and will not toll the limitation period." Response to Petition for Review (Response) at 6 (citing *Kowske v. Life Care Ctrs. of Am., Inc.*, 176 Ariz. 535, 537, 863 P.2d 254, 256 (App. 1993)). Pointing out that in 1992 or 1993 Plaintiff was aware that her exacerbated TMJ problems were the result of Defendant's work, Defendant argues that our "law is clear that a plaintiff, armed with the fact that he has been injured and the identity of the person whose care inflicted the injury, has an obligation to exercise reasonable diligence in pursuing a claim." Response at 7 (citation omitted). Thus, concludes Defendant, Plaintiff did not investigate with reasonable diligence and her claim is barred.

¶13        The relevant statute of limitations bars claims such as this two years "after the cause of action accrues." A.R.S. § 12-542. Application of the statute's simple words has been difficult and the moment at which accrual occurs has been the subject of controversy in cases dealing with claims of professional or fiduciary negligence. Use of the word "accrues" in the statute of limitations permits judicial construction of the events or knowledge that will trigger accrual. *See Kenyon v. Hammer*, 142 Ariz. 69, 76 n.6, 688 P.2d 961, 968 n.6 (1984).

5

### A. The discovery rule

#### 1. Decision of the court of appeals

¶14 The court of appeals agreed with Defendant that Plaintiff "had an opportunity to discover Dr. Ring's negligence when she was treated by another dentist." *Walk*, mem. dec. at ¶ 11. The court of appeals concludes that because Plaintiff had such an opportunity, the statute of limitations began to run. Because Plaintiff "recognized her [TMJ] pain and its connection to Dr. Ring's full-mouth reconstruction at least by June 28, 1994, [the] cause of action accrued no later than that date." *Id*. at ¶ 14 (arguing by analogy to *Kowske*, 176 Ariz. at 537, 863 P.2d at 256). Thus, the 1997 action was time-barred. *Id*.

#### 2. Arizona case law

¶15 In *Kowske*, the court of appeals held that the cause of action in a wrongful death case accrued when the surviving husband obtained medical records concerning his deceased wife. The statute was triggered at that time even though the doctor who forwarded the records stated that he "found no signs of misdiagnosis or mistreatment" and said that the autopsy also revealed nothing significant. *Id*. at 536, 863 P.2d at 255. The court held that the statute was not tolled even though plaintiff was not aware that his wife's death was attributable to negligence until he later consulted an attorney. *Id*. at 537, 863 P.2d at 256.

¶16 *Kowske* certainly is factually relevant to the present case. Both *Kowske* and the present case are situations in which the fact of injury is known but the possibility of negligence is difficult to discern. There are instances, of course, in which an unfortunate result would immediately put the plaintiff on notice that the result is not only unfavorable but might be attributable to some fault and should be investigated. *See, e.g.*, *Trede v. Family Dental Ctr.*, 147 Ariz. 25, 27, 708 P.2d 116, 118 (App. 1985) (injury to plaintiff's hand during tooth extraction); *Speed v. DeLibero*, 580 A.2d 1242 (Conn.App. 1990) (patient underwent elective outpatient surgery and died from anesthesia-induced brain injury). In such cases, one may say as a matter of law that the patient is not only aware of the

6

injury but also on notice to investigate whether the injury is likely attributable to the fault of someone responsible for her care. The bright-line rule drawn by *Kowske* and similar cases is properly applied to such cases and the action accrues even though the plaintiff has not sought an expert opinion on malpractice or a legal opinion that a cause of action exists. *See Kowske*, 176 Ariz. at 537-38, 863 P.2d at 256-57.

¶17            There are also cases, and this is one, in which factual context does not permit finding, as a matter of law, that a patient was promptly on sufficient notice of the confluence of "what" and "who" and that an unhappy result should be investigated to determine whether it is attributable to fault of those responsible for the patient's care. Contrary to Defendant's argument, we do not believe the statute is automatically triggered each time a professional's services have failed to produce the desired result or may even have brought about an adverse result. Indeed, it is often the rule that in such cases the question of accrual is for the jury. *Gust, Rosenfeld & Henderson v. Prudential Ins. Co.*, 182 Ariz. 586, 591, 898 P.2d 964, 969 (1995).

¶18            Over the years, our courts have discussed accrual in a series of cases. From early days, we have treated the question of accrual as one of equitable tolling. Thus, when the defendant secretly removed ore from a mine, we held it was equitable to commence the limitations period on the plaintiff's discovery of the trespass and conversion. *Tom Reed Gold Mines Co. v. United Eastern Mining Co.*, 39 Ariz. 533, 535, 8 P.2d 449, 450 (1932). In an early dental malpractice case that twice came to this court, we construed *Tom Reed* as having two distinct holdings: first, that "limitation does not begin to run against a trespass until the plaintiff knows, or reasonably should know, of the trespass, and [second,] that if the wrong constituting the cause of action is concealed, limitation will not begin to run until such concealment is discovered, or reasonably should have been discovered." *Acton v. Morrison*, 62 Ariz. 139, 144, 155 P.2d 782, 784 (1945).

¶19            The second time that case came to this court, we held that a patient was not barred from bringing an action against his dentist because the patient "should [not] be penalized for failing for even this long period of time to discover the true seat of his troubles." *Morrison v. Acton*, 68 Ariz.

7

27, 36, 198 P.2d 590, 596 (1948). The dentist in *Morrison* left a piece of metal in the patient's jaw after surgical removal of a wisdom tooth. As a result, the patient was left with serious pain in his mouth. The dentist was aware that his drill bit had broken and that this might be the cause of the plaintiff's post-surgical problems, but he failed to explain this to the plaintiff. We held the statute of limitations tolled until the plaintiff's discovery of the facts. In *Morrison*, as in the present case, the plaintiff knew his continuing pain and the failure of his jaw to heal were attributable to the dentist's procedure, but he was unaware of the dentist's negligence. A jury could find the same to be true in the present case.

¶20        The court of appeals adopted and applied the *Morrison* doctrine in *Mayer v. Good Samaritan Hospital*, 14 Ariz.App. 248, 482 P.2d 497 (1971). In *Mayer*, the plaintiff's injuries were caused by an episode of insulin shock sustained in 1964. Although the injuries became apparent that same year, the plaintiff did not file her action until four years later, approximately six months after discovering the physician's negligent conduct. Declining to interpret *Morrison* as resting only on the basis of fraudulent concealment, the court of appeals held that Mayer's action was not time barred. Our court of appeals concluded that the legislature intended to adopt a fair and just statute of limitations that would balance the ease or difficulty a plaintiff has in understanding the cause of an injury with a plaintiff's tardiness in allowing a claim to become stale after the first indications of injury are present. The court said:

> [W]e specifically reject the defendants' alternate argument that the statute begins to run from the time the injuries manifest themselves. However, this point in time may be important in considering the issue as to whether the plaintiff by the exercise of reasonable diligence should have known of defendants' negligence.

*Id*. at 252, 482 P.2d at 501. In *Kenyon*, this court adopted *Mayer*'s formulation of the discovery rule. 142 Ariz. at 73 n.1, 688 P.2d at 965 n.1.

¶21        We approved that formulation again in a case involving application of the discovery rule to a breach of contract claim, holding that "the important inquiry in applying the discovery rule is whether the plaintiff's injury or the conduct causing the injury is difficult for plaintiff to detect . . . ." *Gust, Rosenfeld*, 182 Ariz. at 590, 898 P.2d at 968 (discovery rule applied seventeen years after landlord's

8

breach of lease agreement containing "most favored nations" clause). The statute of limitations protects defendants from "stale claims where plaintiffs have slept on their rights." *Id.* A "blamelessly uninformed plaintiff cannot be said to have slept on his rights." *Id.* at 591, 898 P.2d at 969.[3]

**¶22** We next addressed this problem in *Doe v. Roe*, 191 Ariz. 313, 955 P.2d 951 (1998). Reversing summary judgment, we held there was a genuine factual issue concerning application of the discovery rule, even though the plaintiff filed the action more than two years after she had her first memory that she had been sexually abused by her father. While an injured person "need not know *all* the facts underlying a cause of action to trigger accrual . . . [,] the plaintiff must at least possess a minimum requisite of *knowledge sufficient to identify that a wrong occurred and caused injury*." *Id.* at 323 ¶ 32, 955 P.2d at 961 ¶ 32 (second emphasis added) (citations omitted). *Doe* makes clear it is not enough that a plaintiff comprehends a "what"; there must also be reason to connect the "what" to a particular "who" in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault.

**¶23** While it is ordinarily sufficient when the plaintiff is aware of the injury and its causative agent (the "what and who" elements), summary judgment is warranted only if the failure to go forward and investigate is not reasonably justified. The plaintiff could not be charged with "a duty to file a complaint based on information she subjectively believed to be false or unbelievable at the time." *Id.* at 324 ¶ 35, 955 P.2d at 962 ¶ 35. Thus, the "jury must determine at what point Plaintiff's knowledge, understanding, and acceptance in the aggregate provided sufficient facts to constitute a cause of action." *Id.* at ¶ 36. We pointed out that determinations of the time when discovery occurs and a cause of action accrues "are usually and necessarily questions of fact for the jury." *Id.* at 323 ¶ 32, 955 P.2d at 961 ¶ 32 (citing *Gust, Rosenfeld*, 182 Ariz. at 591, 898 P.2d at 969).

---

[3] Our opinion in *Gust, Rosenfeld* relies on the discovery rule and not fraudulent concealment, while the concurring justice would have based the holding only on fraudulent concealment. *Id.* at 591-92, 898 P.2d at 969-70 (Martone, J., concurring).

**¶24** In the present case, the court of appeals believed that Plaintiff had a reasonable opportunity to discover Defendant's negligence because she was placed under the care of other doctors. Mem. dec. at ¶ 11. No doubt Plaintiff did have an opportunity to discover Defendant's negligence, but the core question is whether a reasonable person would have been on notice to investigate. Plaintiff's doctor assured her he had done nothing wrong, and we do not believe that as a matter of law she was on notice to commence investigating whether negligence was involved. This is especially true when the doctors to whom Defendant later referred Plaintiff for treatment failed to disclose *to her* their belief that Defendant had been negligent.[4] While her failure to question the consulting doctors for such information could be taken as a lack of diligence, we do not believe it can be said as a matter of law that a reasonable person in this circumstance can be required to undertake such questioning or be held accountable for not doing so. This is the very sort of factual determination that must be left for the jury under *Mayer, Kenyon,* and other cases discussed above.

**¶25** Given that *Kowske* was decided before *Doe*, it is understandable that the *Kowske* opinion focuses more on traditional conceptions of the "what and who" elements than on the plaintiff's knowledge or constructive knowledge that a wrong might have occurred. Today, we disapprove *Kowske* to the extent that it suggests accrual occurs in cases of this type before a plaintiff is put on reasonable notice to investigate whether the injury is attributable to negligence.[5] The existence of injury or untoward

---

[4] There is some indication in Doctor Hodges' records that he, too, believed Defendant had fallen below the standard of care. *See post*, n.7.

[5] *Kowske*'s holding on this point cannot be reconciled with the language, and some holdings, in a number of other Arizona cases that state that the statute is triggered when the plaintiff knew or should have known that her doctor, lawyer, or other professional had been negligent. *See, e.g.*, *Yazzie v. Olney, Levy, Kaplan & Tenner*, 593 F.2d 100, 103 (9th Cir. 1979) (legal malpractice action accrues when client knows or should know of lawyer's negligence); *Kenyon*, 142 Ariz. at 73, 682 P.2d at 965 (medical malpractice); *Insurance Co. of N. Am. v. Superior Court*, 162 Ariz. 499, 502, 784 P.2d 702, 705 (App. 1990) (negligence of insurance agent); *Arizona Mgmt. Corp. v. Kallof*, 142 Ariz. 64, 66, 688 P.2d 710, 712 (App. 1984) (legal malpractice); *Long v. Buckley*, 129 Ariz. 141, 143, 629 P.2d 557, 559 (App. 1981) (same); *Russo v. Diethrich*, 126 Ariz. 522, 617 P.2d 30 (App. 1980) (medical malpractice); *Sato v. Van Denburgh*, 123 Ariz. 225, 227, 599 P.2d 181, 183 (App. 1979) (accounting malpractice action accrues when plaintiff knew or should have known of defendant's negligent conduct) (citing *Morrison*, 68 Ariz. 27, 198 P.2d 590; *Abernethy v. Smith*, 17 Ariz.App. 363, 498 P.2d 173 (1972) (medical malpractice)).

result is, of course, one of the factors to be considered on the question of reasonable notice, and our holding today is not meant to relieve a potential plaintiff of the reasonable duty to timely inquire whether any basis exists for legal action.

¶26     We believe that the analysis we have followed since *Tom Reed* in 1932 to date is applicable in the present case. The "what" is the fact of injury. With respect to those in a professional or fiduciary relationship with the tortfeasor, an adverse or untoward result, or a failure to achieve an expected result, is not, as a matter of law, always sufficient notice. To trigger the statute of limitations, something more is required than the mere knowledge that one has suffered an adverse result while under the care of a professional fiduciary. The history of the present statute supports that conclusion.

### 3.     Legislative considerations

¶27     The legislature, we believe, is quite familiar with the distinction between the date of injury and the date of accrual of a cause of action. Former A.R.S. § 12-564(A) provided that the cause of action for malpractice must be brought within two years of the "date of injury." In *Kenyon*, we held this statute unconstitutional insofar as it discriminated "against those with claims against licensed health care providers as distinguished from all other malpractice claims, and which also discriminate internally between classes of medical malpractice claimants . . . ." 142 Ariz. at 83, 682 P.2d at 975. The special medical malpractice limitation statute therefore violated Arizona's equal protection clause — article II, § 13 — of the Arizona Constitution. *See id*. at 87, 682 P.2d at 979. Following the *Kenyon* decision, and evidently not wishing to give lawyers, accountants, stockbrokers, and other professionals the benefit of a date-of-injury trigger, the legislature returned to the accrual rule. Thus, the statute governing the present case provides that negligence actions must be filed within two years from the date of "accrual," specifically "including medical malpractice actions." A.R.S. § 12-542(A)(1). This, of course, takes us back to the accrual rule as formulated in *Mayer* and approved in *Kenyon*. *See ante* ¶ 17.

11

### 4. Other jurisdictions

**¶28** Well-reasoned authority from other jurisdictions supports our conclusion. *See, e.g., Kitzig v. Nordquist*, 97 Cal.Rptr.2d 762 (App. 2000). The plaintiff in *Kitzig* underwent a series of unsuccessful oral surgeries over three years. Her injuries were apparent early in the treatment, and like the instant case, she received assurances from her dentist. Again like the current case, she went to another dentist and received further assurances. Toward the end of the third year, she sought the advice of a third dentist, who questioned the original dentist's work. After filing suit, she countered the defendant's statute of limitations defense with the statutory discovery rule, and the court held for her. "[T]he statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing . . . ." *Id.* at 767 (quoting *Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 927 (Cal. 1988)). The court concluded that Kitzig could not be found, as a matter of law, to have subjectively suspected any wrongdoing with respect to her implant procedures at that time. *Id.* at 768-69.

**¶29** A similar result was reached in *Hughes v. United States*, 263 F.3d 272 (3d Cir. 2001). The court held that the statute did not run against a patient who became a quadruple amputee because of gangrene resulting from an allergic drug reaction until the patient learned that had the reaction been timely diagnosed, it could have been treated and arrested with medication. The action accrued only when the plaintiff discovered the known injury was due to "progression of the disease rather than the disease itself" and that "failure of his doctors to diagnose, treat or warn him led to his deteriorating condition." *Id.* at 276 (quoting *Augustine v. United States*, 704 F.2d 1074, 1078 (9th Cir. 1983)); *see also Waits v. United States*, 611 F.2d 550 (5th Cir. 1980) (holding that Federal Tort Claims Act claimant's awareness of injury was not enough to trigger statute, absent knowledge of act or omission responsible for causing it).

### 5. Application

**¶30** In light of our cases and the statutory history and authority from other jurisdictions, we refuse to adopt the bright-line "what and who" rule advanced by Defendant. At the very least, we

12

interpret the "what" broadly enough to require the knowledge that would put a reasonable patient or client on notice to investigate whether the injury may be attributable to negligence of a professional or fiduciary. Given the facts of the present case, one cannot say as a matter of law that Plaintiff slept on her rights or was dilatory in failing to investigate or file. The issue of discovery and consequent accrual is for the jury.

¶31        In reaching this conclusion, we are well aware that there is another side of the coin and cases to support the opposing view. *See, e.g.*, *United States v. Kubrick*, 444 U.S.111, 122-23, 100 S.Ct. 352, 359-60 (1979) (claim accrued under Federal Tort Claims Act when plaintiff had knowledge of injury and likely cause — loss of hearing due to administration of antibiotic — not when plaintiff learned that administration of drug might have been contrary to medical standards). The *Kubrick* majority held that the action accrued when the plaintiff was made aware of his injury and knew it resulted from the treatment given him, even if he was not aware there might have been negligence.

¶32        Perhaps the best argument for this view is that by rejecting *Kubrick*'s bright-line approach, we allow too many cases on discovery to go to the jury. It is true that in some cases the substantive merits of a claim may influence jurors to favor the plaintiff on the procedural question of discovery and potential barring of the action by the statute of limitations. This, no doubt, would be prevented by adopting a bright-line rule. But such a rule would also have some unjust effects. For example, it would bar meritorious actions by those who have been reassured by their doctors, those who have no reason to believe they were negligently injured, or those who had no way to ascertain they were injured through some wrongdoing. In addition, it would inject an element of mistrust into the relationship between patients and clients on the one hand and their professional care-givers and advisors on the other. In cases in which an adverse outcome is not in itself sufficient to put a reasonable person on notice to investigate whether a known injury is attributable to negligence, patients and clients should not be required to commence investigation of a malpractice action. We conclude that, on balance, the better rule is the one we have followed before and follow today.

¶33     The *Kubrick* majority justified the bright-line rule with the following reasoning:

> A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government. If there exists in the community a generally applicable standard of care with respect to the treatment of his ailment, we see no reason to suppose that competent advice would not be available to the plaintiff as to whether his treatment conformed to that standard. If advised that he has been wronged, he may promptly bring suit.

*Id.* The facts of the present case indicate that such advice is not always so readily forthcoming. Whatever Defendant believed about the propriety of his treatment, he did not tell Plaintiff about the opinion of his colleague or colleagues, and they did not volunteer such information. It is undeniably true that the "best medical treatment sometimes fails, . . . or produces bad side effects." *Kitzig*, 97 Cal.Rptr.2d at 768 (quoting *Gutierrez v. Mofid*, 705 P.2d 886, 899 (Cal. 1985)). We decline to adopt a rule that, in every case, would require a patient or client who suffered an adverse result to question her doctors or lawyers about the possible sins of their predecessors. We therefore conclude that for the present case, the questions of discovery, diligent investigation, and resulting accrual were for the jury.

**B.     Fraudulent concealment**

¶34     It is, of course, quite possible that a jury would find that the facts known to Plaintiff in 1994 put her on notice that she may have been injured through Defendant's negligence and that she failed to take reasonable steps to determine that fact. If so, the statute would have begun to run in 1994 and the 1997 complaint would have been untimely. We must therefore turn to Plaintiff's alternative theory — fraudulent concealment. This theory is also well-rooted in Arizona law. We long ago held that a patient and a doctor were in a fiduciary relationship "calling for frank and truthful information from" doctor to patient. *Acton*, 62 Ariz. at 143, 155 P.2d at 784. "Fraud practiced to conceal a cause of action will prevent the running of the statute of limitations until its discovery." *Id.* at 144, 155 P.2d at 784. If the doctor "fraudulently concealed "from [his patient] the fact of his negligence,"

14

the statute of limitations would be tolled. *Id.* (citing *Peteler v. Robison*, 17 P.2d 244, 249 (Utah 1932), *disapproved on other grounds by Christiansen v. Rees*, 436 P.2d 435, 436 (Utah 1968)).

¶35            Moreover, if fraudulent concealment is established, the patient is relieved of the duty of diligent investigation required by the discovery rule and the statute of limitations is tolled "until such concealment is discovered, or reasonably should have been discovered." *Id.* (citing *Tom Reed*, 39 Ariz. 533, 8 P.2d 449).  In fraudulent concealment cases, the duty to investigate arises only when the patient "discovers or is put upon reasonable notice of the breach of trust . . . ."[6] *Id.* (quoting *Griffith v. State*, 41 Ariz. 517, 528, 20 P.2d 289, 293 (1933)).  Thus, our cases and those from other jurisdictions that recognize a fiduciary relationship agree that an actual knowledge standard applies to triggering the statute of limitations for a plaintiff who establishes a breach of the fiduciary duty of disclosure. *See, e.g.*, *Demoulas v. Demoulas Super Mkts., Inc.*, 677 N.E.2d 159, 159 (Mass. 1997).

¶36            In the present case, the court of appeals gave the duty of disclosure a somewhat limited interpretation.  "Fraudulent concealment occurs when a party wrongfully conceals *facts giving rise to the cause of action* so as to prevent a potential plaintiff from reasonably discovering the claim's existence during the limitation period."  Mem. dec. at ¶ 18 (emphasis added).  Further, the court of appeals said, "Dr. Ring never withheld or misrepresented the facts relating to Walk's injury." *Id.* at ¶ 19.

¶37            But what were the facts?  Certainly Defendant disclosed what Plaintiff already knew — that she had TMJ problems and that they followed upon and presumably were the result of the reconstruction work.  But we do not believe the duty to disclose is so limited.  The statute is never triggered until the injury manifests itself; fraudulent concealment occurs with nondisclosure of the facts pertaining to negligence. *See Morrison*, 68 Ariz. at 34-35, 198 P.2d at 595; *Tom Reed*, 39 Ariz.

_____

[6] Presumably, actual knowledge of the doctor's negligence equates with discovery of the breach of trust.

15

at 535, 8 P.2d at 450. Defendant did not disclose all he knew. He knew that one and perhaps both[7] of the colleagues to whom he referred Plaintiff for help with her TMJ problems believed Defendant had been negligent in using improper techniques and in undertaking work that was contraindicated for her. He told Plaintiff, however, that he had done nothing wrong. Did he believe that, or was he simply allaying her suspicions and concealing the true cause of her injury? This, of course, is a jury question. Moreover, our cases do not limit the duty to disclose to actual knowledge. A doctor must disclose what he "knew or was chargeable with" knowing. *Morrison*, 68 Ariz. at 34-35, 198 P.2d at 595. At Doctor McDonald's deposition, it appeared that at least by the time the action was filed, Defendant did not argue with Doctor McDonald's view.

> Q. Now, do you mean to imply here that Dr. Ring told you that he thought he was negligent in treating Mrs. Walk?
>
> A. He told me that he was — he felt that he was over his head with this case, that this was — he had taken a class in California on how to do this reconstruction technique, and that this was his first case and attempt to try that and that he explained to me how he did it. And we discussed what was wrong with that technique, and not just about anybody, but specifically in this person.
>
> And this letter went to Dr. Ring for his approval before I sent it [to CNA]. I said, "this is serious language here, Dale."

Deposition of Doctor McDonald, October 21, 1998, at 111.

¶38 This record does not permit us to make any definite conclusion with respect to the issue of Defendant's actual belief. We know only what Doctor McDonald told Defendant, what Defendant said to Plaintiff, what he may have later conceded to Doctor McDonald, but not what Defendant actually believed. We do know that when asked on deposition, Defendant said he never told Plaintiff that he had made a mistake or that the problem was due to any fault on his part. In fact, he said that he "was very careful to do just the opposite." Deposition of Doctor Ring, July 20, 1998, at 134. In fact, it is not clear that Defendant ever told Plaintiff that her TMJ problems were caused by his reconstruction

---

[7] According to a January 16, 1992, entry in his chart for Plaintiff, Doctor Hodges evidently told Defendant that the occlusions placed by Defendant may have been improper and rotated Plaintiff's mandible.

work.  His note, quoted *ante* ¶ 4, is somewhat ambiguous on the point, and he testified at deposition that in referring Plaintiff to yet another doctor, a chiropractic cranio-osteopath, for treatment of her TMJ problems, he did not "recall relating Mrs. Walk's problems to her dental work."  *Id*. at 136.

¶39         Certainly if Defendant thought he may have been negligent in his treatment of Plaintiff, his fiduciary duty to disclose required him to explain that to her.  *See Fowles v. Lingos*, 569 N.E.2d 416, 420 (Mass.App. 1991).  What becomes difficult is the question of whether Defendant was under a duty to give Plaintiff Doctor McDonald's opinion of his negligence, even if Defendant honestly disagreed with it.  *Id*. at 416 (there is no concealment if "there is [only] a difference of opinion concerning the standard of care" or failing to "divulge some adverse criticism.") (quoting *Geisz v. Greater Baltimore Med. Ctr.*, 545 A.2d 658, 672 (Md.App. 1988).

¶40         But the present case is not one in which there is a difference of opinion between unrelated specialists in the field or in the learned journals.  The dentists to whom Defendant referred Plaintiff, specialists in whom Defendant had confidence and on whose opinions he relied, explained in detail what was wrong with Defendant's treatment.  Unless Defendant had some principled basis for disagreement, the candor required by his fiduciary relationship required him to reveal the opinions of those specialists to Plaintiff.  "[I]f the fiduciary nature of the relationship charges the fiduciary with a duty to disclose his wrong to the plaintiff and he fails to disclose, the statute of limitations will be tolled." *Bourassa v. LaFortune*, 711 F.Supp. 43, 46 (D.Mass. 1989).  No doubt Defendant had no intent to deceive, but as we said in *Morrison*, to establish concealment a patient need only show a "breach of legal or equitable duty. . . .  Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud."  68 Ariz. at 35, 198 P.2d at 595.

¶41         Finally, we must bear in mind that Defendant did not just remain silent but made an affirmative statement that he had done nothing wrong.  Having broached the subject of fault, one might conclude that candor would have required him to give Plaintiff all the information on the question, including Doctor McDonald's opinion.  If not, Plaintiff had the right "to rely [on her doctor's] advice

17

"without suspecting [she] was being deceived." *Lasley v. Helms*, 179 Ariz. 589, 592, 880 P.2d 1135, 1138 (App. 1994).

¶42     We therefore conclude that there are factual issues on the question of constructive fraud. If those issues are resolved in Plaintiff's favor, the statute of limitations would have been tolled until the time when Plaintiff had actual knowledge of the possibility of negligence or learned of Doctor McDonald's opinion about the treatment she received.

## CONCLUSION

¶43     The trial judge erred in granting summary judgment on the facts of this case. Reasonable minds could differ with regard to whether, more than two years before filing her action, Plaintiff knew or should have known facts that would have put a reasonable person on notice to investigate whether her injury had been wrongfully inflicted. The same is true regarding her claim of fraudulent concealment. On this record, a jury could find that Defendant withheld from Plaintiff information that his fiduciary relationship required him to reveal. Both issues should be decided by a jury.

¶44     Accordingly, the court of appeals' memorandum decision is vacated, the trial judge's order granting summary judgment is vacated, the judgment is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
STANLEY G. FELDMAN, Justice

CONCURRING:

_____
CHARLES E. JONES, Chief Justice

_____
RUTH V. McGREGOR, Vice Chief Justice

_____
THOMAS A. ZLAKET, Justice

18