NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

ADRIENNE N. WILSON, in her capacity as Trustee of the Wilson Trust
dated July 2, 1992; MASTER REAL ESTATE DEVELOPMENT, LLC, and
Arizona limited liability company[1],
*Plaintiffs/Appellees*,

*v.*

JOSEPH R DRAKE, III, et al.,
*Defendants/Appellants.*

No. 1 CA-CV 16-0514
FILED 12-7-2017

Appeal from the Superior Court in Maricopa County
No.  CV2014-007586
The Honorable James T. Blomo, Judge

**REVERSED AND REMANDED**

COUNSEL

Burch & Cracchiolo, PA, Phoenix
By Bryan F. Murphy, Laura Meyer
*Counsel for Plaintiffs/Appellees*

---

[1]     On the court's own motion, the caption is hereby amended as reflected in this decision and shall be used on all further documents filed in this appeal.

Lewis, Roca, Rothberger, Christie, LLP, Phoenix
By Randall S. Papetti, Daniel A. Arellano
*Counsel for Defendants/Appellants*

---

**MEMORANDUM DECISION**

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Jennifer B. Campbell and Judge Margaret H. Downie (retired) joined.

---

**B R O W N**, Judge:

¶1 Joseph Drake, III ("Drake") appeals the superior court's judgment entered against him for breach of contract. For the following reasons, we reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In 2002, four individuals, including Harry Wilson ("Wilson")[2] and Drake, formed a limited partnership. Wilson contributed $378,000 of the $388,000 of capital that was invested to fund the limited partnership. In September 2003, three of the partners formed Master Real Estate Development, LLC ("MRED"), which replaced the limited partnership. MRED was formed for the purpose of owning, developing, and managing real property. The operating agreement provided that MRED would be governed by Wilson, his son (Steven), and Drake, as MRED's managers. The members were Steven, Drake, and Harry and Frances Wilson (now deceased), as Trustees of the Wilson Trust dated July 2, 1992.

¶3 In September 2003, the Wilson Trust conveyed real property to MRED to develop three office condominiums in the City of Mesa. MRED executed a promissory note for $975,062 plus interest at the rate of 6% per annum in favor of Wilson and his wife. The note was payable in full within 24 hours of the close of escrow of the sale of the last of the three condominium units. The operating agreement further provided that upon the sale of the last unit, MRED's members would pay $550,000 for their

---

[2] Unless otherwise noted, our references to Wilson throughout the decision relate to his involvement as a manager of MRED.

2

membership interests, based on an agreed-upon value as of September 2003 in the amount of $ 1,650,000.

¶4            Wilson was actively involved in MRED's development of the three units, known as the Three Falls Business Center ("Center"). In addition to capital and property contributions, he sought out lenders and private investors to fund construction of the Center. Wilson maintained detailed ledgers of pending and estimated construction costs, and directed MRED members on how to negotiate with investors.

¶5            After construction, Wilson was actively involved in the marketing and sale of the units. He regularly received bills related to property taxes, property insurance, maintenance, landscaping, and other costs for the units between the summer of 2003 and July 2005. Wilson also visited the units after they were constructed every two to three months between 2003 and 2005. Unit 3 was sold in September 2003 for $546,440 and Unit 1 was sold in May 2004 for $490,000.

¶6            In October 2004, without informing Wilson, Drake personally borrowed $330,000 from JRS Holdings, LLC ("JRS") and recorded a deed of trust against Unit 2 to secure the loan. According to Drake, a "significant" portion of the loan was used to pay expenses for the Center. On behalf of MRED, Drake sold Unit 2 on July 29, 2005. The JRS loan was still unpaid at the time of the sale of Unit 2, and the balance, in the amount of $355,801.67, was paid off from the proceeds of the sale. Although the sale of the last unit triggered the payment of each member's membership interest, Drake did not inform Wilson that the last unit had been sold, presumably to avoid payment of his membership interest as well as discovery of the payoff of his personal loan.

¶7            It is undisputed that on April 3, 2006, Drake told Wilson, in writing, that Unit 2 remained unsold. Further, Drake claimed that he sold off his stock holdings to buy MRED out of the remaining building and return Wilson his investment money. Included in the correspondence was a post-dated (April 20) check for $753,130, payable to MRED. When Wilson went to deposit the check, it failed for insufficient funds. Drake sent Wilson two other checks; one for $36,000 dated January 9, 2007, payable to Harry and Frances Wilson and the other for $330,000 dated February 13, 2007, payable to MRED. Both checks failed for insufficient funds. Drake does

3

not dispute that he told Wilson, in the April 3 correspondence, that Unit 2 had not been sold.[3]

¶8           Wilson first discovered the sale of Unit 2 in the summer of 2012 when he visited the Center after traveling from his residence in Lake Havasu. Noticing that Unit 2 was occupied, Wilson contacted Drake, who confirmed Unit 2 had been sold. Drake orally said the money owed to him was reinvested in another project, and that Wilson would receive the proceeds on or about August 26, 2013, but the promised funds were never paid. Wilson demanded that Drake provide an accounting and pay the sums to Wilson that were due, but Drake failed to comply.

¶9           Wilson filed a lawsuit on January 24, 2014, alleging breach of contract, fraud, and misrepresentation. Drake responded that the claims were barred because they were not filed within the statute of limitations. During discovery, Wilson became aware that Drake used the proceeds from Unit 2's sale to satisfy the JRS deed of trust encumbering Unit 2. Wilson then amended his complaint on April 1, 2015, based on the discovery of Drake's encumbrance of Unit 2 and use of company funds to pay off a personal debt on November 26, 2014, when Drake revealed such information in his interrogatory answers. As pertinent here, Wilson's amended complaint alleged that Drake breached his contractual agreements under MRED's operating agreement by encumbering company assets to secure a personal loan. Wilson further alleged the statute of limitations was tolled by Drake's fraudulent concealment of material facts giving rise to the claim.

¶10          Wilson moved for partial summary judgment on his claim that Drake breached MRED's operating agreement. Drake countered with evidence that he claimed precluded summary judgment because a jury should determine whether the statute of limitations was tolled. The superior court granted Wilson's motion, summarily concluding there were no material issues of fact that Drake breached the operating agreement and that Wilson's breach of contract claim was not barred by the statute of

---

[3]      According to Wilson, Drake showed Wilson documents in 2006 that "purported to represent a contract for the sale of one of the condominium units, and said that this contract provided for a $90,000 earnest deposit." Drake told Wilson the deal failed to close and the buyer forfeited the $90,000 earnest money, which Drake paid to Wilson. Drake denies this allegation, which is not supported by any evidence other than the allegation made in the verified amended complaint. Regardless, this alleged fact does not affect our analysis.

limitations. The court denied Drake's motion for reconsideration and entered a judgment awarding \$355,801.67 in damages, \$37,935.70 in attorneys' fees and costs, and prejudgment interest from July 29, 2005. This timely appeal followed.

## DISCUSSION

**¶11**　　Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). We review a "grant of summary judgment de novo, viewing the facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Hourani v. Benson Hosp.*, 211 Ariz. 427, 432, ¶ 13 (App. 2005). "We will affirm if the trial court's disposition is correct for any reason." *Logerquist v. Danforth*, 188 Ariz. 16, 18 (App. 1996).

**¶12**　　A complaint for breach of a written contract must be filed within six years after the cause of action accrues. Ariz. Rev. Stat. ("A.R.S.") § 12-548(A)(1). "When discovery occurs and a cause of action accrues are usually and necessarily questions of fact for the jury." *Doe v. Roe*, 191 Ariz. 313, 323, ¶ 32 (1998). Because Wilson filed his breach of contract claim on January 24, 2014, the claim is barred if it accrued before January 24, 2008, unless an exception applies.

**¶13**　　Arizona recognizes the discovery rule, meaning that "a plaintiff's cause of action does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 182 Ariz. 586, 588 (1995). In *Gust,* our supreme court extended the discovery rule to breach of contract claims governed by A.R.S. § 12-548. *Id.* at 591. Drake asserts the *Gust* standard applies here; however, that case did not involve a claim of fraudulent concealment.

**¶14**　　Wilson, relying on *Walk v. Ring*, 202 Ariz. 310 (2002), counters that because Drake fraudulently concealed the cause of action, the statute of limitations is tolled until the claim is actually discovered. In *Walk*, the plaintiff sued the defendant, her dentist, for medical malpractice after enduring years of pain following a full mouth reconstruction. *Id.* at 312-13, ¶¶ 4-5, 9. The defendant knew he committed malpractice but never informed plaintiff. *Id.* at 313, ¶¶ 8-9. Plaintiff sued years later upon learning of defendant's malpractice and the defendant successfully moved for summary judgment based on the statute of limitations. *Id.* at ¶¶ 9-10. Our supreme court reversed, concluding that a jury could find the statute

of limitations was tolled until the time Plaintiff "had *actual knowledge* of the *possibility of negligence* or learned of [the second doctor's] opinion about the treatment she received." *Id.* at ¶ 42 (emphasis added).

¶15 Relying on *Walk*, Wilson argues that when a defendant fraudulently conceals facts that would give rise to a cause of action, the claim does not accrue until the plaintiff has *actual knowledge* of the claim. Thus, Wilson contends his cause of action for breach of the operating agreement did not accrue until he received actual notice on November 26, 2014, that Drake used MRED funds to pay off a personal obligation.

¶16 Although the *Walk* court's analysis of fraudulent concealment might be construed as alternating between an actual knowledge and reasonable discovery standard, when read in context, it is plain to us that "if fraudulent concealment is established, . . . the statute of limitations is tolled 'until such concealment is discovered, or reasonably should have been discovered.'" *Id.* at 319, ¶ 35 (quoting *Acton v. Morrison*, 62 Ariz. 139, 144 (1945)). The *Walk* court added that "[i]n fraudulent concealment cases, the duty to investigate arises only when the patient 'discovers or is put upon reasonable notice of the breach of trust.'" *Id.* (quoting *Acton*, 62 Ariz. at 144). At the conclusion of the opinion, the court further clarified the "reasonable discovery" standard:

> Reasonable minds could differ with regard to whether, more than two years before filing her action, Plaintiff knew or should have known facts that would have put a reasonable person on notice to investigate whether her injury had been wrongfully inflicted. The same is true regarding her claim of fraudulent concealment.

*Id.* at 321, ¶ 43. Moreover, the court's holding in *Walk* is supported by decades of similar holdings.[4] Thus, we apply the same standard here in

---

[4] *See, e.g.*, *Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 131 (1966) ("This court has held that no matter what the form of action, if it is based upon fraudulent concealment by one occupying a fiduciary relationship or position of trust to the complaining party, the statute of limitations does not begin to run until that party discovers or is put upon reasonable notice of the breach of trust."); *Tom Reed Gold Mines Co. v. United E. Mining Co.*, 39 Ariz. 533, 535 (1932) ("[A] defendant who, by his conduct, has prevented a plaintiff from knowing of the existence of the facts upon which an action is based, is estopped from setting up as against such plaintiff the bar of the statute of limitations until after the plaintiff knows,

deciding whether Wilson, prior to January 24, 2008, knew or should have known about facts that would have put a reasonable person on notice to investigate whether Drake had breached the operating agreement.

¶17        Wilson alleged that by using MRED property to secure repayment of a personal debt, Drake violated the operating agreement by (1) acting on behalf of MRED without the consent of all the managers, (2) contracting for a debt or obligation or to incur liability on behalf of the company, (3) failing to disclose material transactions relating to MRED, and (4) taking priority over other members in the return of capital.   The operating agreement restricts the authority of the managers to act on behalf of MRED without approval of the other managers unless it is set forth in the agreement. The agreement obligates each manager to keep the other managers informed about material transactions relating to the company, and to fully disclose their knowledge of the company's business and affairs. Additionally, the agreement prohibits any member from having priority over other members with regard to the return of capital contributions or with regard to distribution of profits and losses, except with regard to loans a member has made to the company.

¶18        We therefore analyze the facts before us to determine whether, despite Drake's obvious misrepresentations, a jury could properly conclude that a reasonable person in Wilson's situation should have been alerted to investigate possible claims against Drake.   For the reasons outlined below, a jury could find that Wilson, as a manager of MRED, received facts that would inform a reasonable person to investigate whether Drake breached the operating agreement by failing to inform Wilson about the sale of Unit 2 or by encumbering Unit 2 for Drake's personal benefit.

¶19        First, Wilson received three checks from Drake, with whom he had worked closely for several years in developing, marketing, and selling the Center.  The checks totaled over one million dollars, but none could be cashed due to insufficient funds.   Wilson did not follow up with Drake to question why there were insufficient funds for each check, nor did Wilson question why Drake was attempting to pay MRED.   Although Drake essentially explained that he felt badly and the money was to return Wilson's investment and buy MRED out of Unit 2, a reasonable person could view it as suspicious, particularly when there was not a purchase

or reasonably should have known, of the existence of such facts."); *Estate of Kirschenbaum v. Kirschenbaum*, 164 Ariz. 435, 438 (App. 1989) ("[T]he statute of limitations in a fraud case starts to run when the plaintiff, by reasonable diligence, should have learned of the fraud.").

contract. Additionally, why would Drake send Wilson three checks totaling substantially more than the amount of the proceeds of the sale of Unit 2, when there was no evidence Drake owed Wilson or MRED the money, and pursuant to the agreement, the members of MRED were to divide evenly profits and losses? Objectively this seems at a minimum highly unusual.

¶20 Second, because the first two units sold quickly, it is strange that Wilson, who was actively involved in MRED's leadership, did not inquire for several years why Unit 2 had not sold or ask what marketing or other efforts were being pursued to dispose of a completed office condominium that was generating no income. There is no indication that Wilson requested a managers' meeting to discuss Unit 2 or any other matters relating to MRED, as permitted by the operating agreement. The agreement also provides for an annual meeting on September 30 each year, but nothing in the record indicates such meetings occurred.

¶21 Third, Wilson regularly received bills relating to expenses for the Center between 2003 and July 2005. After 2005, however, Wilson did not receive any bills for the Center. Because Wilson controlled and managed MRED's bank account, at least initially, presumably he would have questioned why MRED was no longer paying such bills if it still owned Unit 2.

¶22 Fourth, Wilson made no effort to independently verify whether Unit 2 had been sold. If Wilson had visually inspected Unit 2 prior to January 24, 2008, it would have been obvious it had been sold, as he finally did in 2012. Also, Wilson did not receive annual property valuations from the Maricopa County Assessor's Office after 2006 because Unit 2 sold in 2005. If Wilson had inquired about the status of Unit 2 with the recorder's office, the assessor's office, or a title company, he would have been informed that Unit 2 had been sold. Wilson would have then realized Drake had breached the operating agreement by failing to inform the other managers of this material transaction. And, a reasonable person in that position would have made further inquiry as to what happened with the proceeds. Additional inquiry from the recorder's office also would have revealed the recording of the JRS deed of trust and the release of that deed of trust at the time of the sale of Unit 2.

¶23 Finally, despite these red flags, there is no evidence in this record that Wilson ever inquired into bank records, or requested an accounting from Drake. *See* A.R.S. § 29-607 (listing the records a limited liability company must keep, including tax returns and financial

statements, and noting a member's right to inspect and copy such records). Nor is there any evidence before us indicating how Wilson or Drake accounted for the sale of Unit 2 when filing their income tax returns from 2005 going forward. Moreover, the record is silent as to whether Wilson ever asked his son, the third manager, about any of the issues noted above, including MRED's financial condition and why Unit 2 had not been sold.

**¶24**　　　　Given these circumstances, neither the evidence presented by Wilson regarding fraudulent concealment, nor the evidence presented by Drake about whether Wilson was put on reasonable notice to investigate whether a breach of contract occurred prior to January 24, 2008, support judgment as a matter of law. Instead, a jury could reasonably conclude that Wilson's breach of contract claim was tolled based on Drake's fraudulent concealment of facts leading to discovery of the breach, or, the same jury could reasonably conclude that the claim was not tolled and is therefore time barred. *See Ulibarri v. Gerstenberger*, 178 Ariz. 151, 162 (App. 1993) ("Whether this concealment occurred and was sufficient to toll the statute of limitations is a factual dispute to be resolved by the fact finder."); *Anson v. Am. Motors Corp.*, 155 Ariz. 420, 429 (App. 1987) ("Whether the appellees did in fact fraudulently conceal . . . is not to be resolved by this court, but remains an issue of fact to be determined by the trier of fact.").

**CONCLUSION**

**¶25**         For the foregoing reasons, we reverse the superior court's grant of summary judgment and remand for further proceedings consistent with this decision.[5]

---

[5]      This decision does not address the statute of limitations, its accrual or tolling as it relates to any of Wilson's other claims against Drake.