IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| TANQUE VERDE UNIFIED SCHOOL DISTRICT NO. 13 OF PIMA COUNTY, a political subdivision of the State of Arizona, | ) ) ) ) ) | |
| Petitioner, | ) ) | 2 CA-SA 2003-0067 DEPARTMENT B |
| v. | ) ) | O P I N I O N |
| HON. DEBORAH BERNINI, Judge of the Superior Court of the State of Arizona, in and for the County of Pima, | ) ) ) ) | |
| Respondent, | ) ) | |
| and | ) ) | |
| TANQUE VERDE COALITION, INC., an Arizona not-for-profit corporation; TIMOTHY MILES and LAURA MILES, husband and wife; JAMES JONES and PENELOPE JONES, husband and wife; GARY W. STONE and PAMELA J. PROVOST-STONE, husband and wife; ALLAN H. BOWERMASTER and BARBARA L. BOWERMASTER, husband and wife; ROBERT G. BROWN and VIRGINIA L. BROWN, husband and wife; JAMES BARTUSKA and BONNIE BARTUSKA, husband and wife; CAROL RENTSCHLER RHODES, an unmarried woman; DAVID S. MOSER and CAROLYN R. MOSER, husband and wife; and JOSEPH G. KLINGER and VIRGINIA A. KLINGER, husband and wife, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Real Parties in Interest. | ) ) | |

SPECIAL ACTION PROCEEDING

RELIEF GRANTED

---

DeConcini McDonald Yetwin & Lacy P.C.
  By Denise M. Bainton, Wayne E. Yehling, and
    Lisa Anne Smith                                      Tucson
                                   Attorneys for Petitioner

Lewis & Roca LLP
  By John N. Iurino, John Hinderaker, and
    Erin O. Simpson                                  Tucson
                  Attorneys for Real Parties in Interest

Terry Goddard, Arizona Attorney General
  By Susan P. Segal, Dena Epstein, and Judith Darknall         Phoenix
                              Attorneys for Amicus Curiae
                           Arizona School Facilities Board

Arizona Center for Law in the Public Interest
  By Timothy M. Hogan                               Phoenix
                              Attorneys for Amicus Curiae
                           School Finance Reform Group

Christopher P. Thomas                                Phoenix
                       Attorney for Amicus Curiae Arizona
                          School Boards Association, Inc.

---

E S P I N O S A, Chief Judge.

¶1       In this special action, Tanque Verde Unified School District No. 13 of Pima County challenges the respondent judge's rulings that the District's board violated Arizona's open meeting laws in selecting a site on which to build a high school and that the District may not use funds from the Arizona School Facilities Board (SFB) to pay severance damages in a condemnation action.[1]

---

[1]Several residents, voters, taxpayers, and parents of students in the District also filed a petition for special action challenging the respondent judge's rulings. By separate order filed today, we decline to accept jurisdiction of that petition because we conclude the petitioners lack standing to assert that challenge. Their motion to intervene in the trial court was denied for failure to comply with the requirements of Rule 24(c), Ariz. R. Civ. P., 16 A.R.S., Pt. 1. The only case they cited to support their claim of standing is inapplicable because the petitioner there had properly

The rulings culminated in a judgment entered June 30, 2003, in favor of real parties in interest, Tanque Verde Coalition and various persons who live adjacent to or near the proposed high school site (collectively, the Coalition). The petition for special action was filed two days later. Because we find the respondent judge erred in several respects, we accept jurisdiction and grant relief.

## Special Action Jurisdiction

¶2        The respondent's judgment recited the prior ruling invalidating all actions the District had taken in selecting a site to build a high school and in directing its attorneys to file a lawsuit to obtain the property by eminent domain. The judge also ruled that the District's condemnation action, then pending before another judge, was void ab initio and that the transfer, pursuant to that lawsuit, of the property's title to the District is void. In addition, the judge concluded that the May 2001 election the District had conducted did not authorize it to purchase a site for the high school. Based on those rulings, the judge enjoined the District from physically altering the property or initiating another condemnation action without first obtaining approval from the SFB in each of the last two steps of its three-step process for funding new schools. And the judge permanently enjoined the District from using SFB funds to pay severance damages in a condemnation action to obtain any site it selects.

¶3        Ordinarily, this court does not accept special action jurisdiction in a case in which a final judgment has been entered. See Ariz. R. P. Special Actions 1(a), 17B A.R.S. ("Except as authorized by statute, the special action shall not be available where there is an equally plain, speedy, and adequate remedy by appeal . . . ."). However, our "[s]pecial action jurisdiction is highly discretionary." Blake v. Schwartz, 202 Ariz. 120, ¶7, 42 P.3d 6, ¶7 (App. 2002); see also

_____

intervened in the proceedings in the trial court. Renck v. Superior Court, 66 Ariz. 320, 187 P.2d 656 (1947).

3

A.R.S. § 12-120.21(A)(4) (special action jurisdiction of court of appeals not confined by appellate jurisdiction). We appropriately accept jurisdiction when the issues raised are ones of first impression, involve purely legal questions, are of statewide importance, and are likely to recur. Piner v. Superior Court, 192 Ariz. 182, 962 P.2d 909 (1998); Blake.

¶4 All of those elements are present in this case. The issues are legal ones, as evidenced by the parties having filed cross-motions for summary judgment below in which they asserted the essential facts were undisputed. Both the specific open meeting law issue and the question about SFB funds are issues of first impression and of statewide importance. Moreover, although the District may appeal the judgment, even an accelerated appeal would be inadequate in light of the respondent judge's injunction prohibiting the District from beginning construction of its planned high school until its board conducts another site selection process and again obtains funding approval from the SFB. Finally, the appendices to the petition and response contain all the pertinent documents from the trial court proceedings, enabling us to fully review the issues.

¶5 For the foregoing reasons, we exercise our discretion and accept jurisdiction of the special action. And, because we conclude that the respondent judge abused her discretion by committing errors of law in several of her rulings, we grant relief. See Ariz. R. P. Special Actions 3(c); Twin City Fire Ins. Co. v. Burke, 204 Ariz. 251, 63 P.3d 282 (2003).

Factual and Procedural Background

¶6 The District's board voted on May 15, 2002, to build a high school at the intersection of Catalina Highway and Snyder Road in Tucson (the Snyder site), the second time it had chosen the site. On June 13, the board voted to initiate a condemnation action to acquire the Snyder site. Several months later, on October 24, the board voted to pay necessary attorney's

4

fees for the condemnation action, and on October 28, the District filed a lawsuit in Pima County Superior Court to obtain the site.

¶7 On November 25, the Coalition filed a lawsuit against the District and the SFB. The complaint alleged that (1) the defendants had violated the open meeting laws by choosing the Snyder site in improperly held executive sessions; (2) the District's election in May 2001 asking voters for authority to acquire a site and construct a high school had been conducted in violation of A.R.S. § 15-341(A); (3) SFB funds cannot properly be used to pay for severance damages in condemnation actions; and (4) the SFB's approval of the District's high school construction plan had expired before the SFB had voted to extend its approval for an additional year. In a fifth count, the Coalition sought a declaratory judgment on each of its assertions. After the SFB demanded and was granted a change of venue to Maricopa County, the Coalition dismissed it from the lawsuit, thus eliminating count four of the complaint.

¶8 In late February, the Coalition moved for partial summary judgment on its claims that the District had violated the open meeting laws and that it could not use SFB funds to pay severance damages in the condemnation action. The District responded to the motion and then filed a cross-motion for summary judgment on the four remaining counts. In its response to the District's motion, the Coalition also asked for summary judgment on the claim that the District lacks voter approval to spend its own funds to build the high school. The respondent judge denied the District's motion and granted summary judgment in favor of the Coalition on all four counts. The judge later denied the District's motion for reconsideration and rejected its objections to the proposed judgment.

Open Meeting Law Violations

¶9        The core provision of Arizona's open meeting laws, A.R.S. §§ 38-431 through 38-431.09, states:

> All meetings of any public body shall be public meetings and all persons so desiring shall be permitted to attend and listen to the deliberations and proceedings. All legal action of public bodies shall occur during a public meeting.

§ 38-431.01(A). The legislature included the following provision in which it expressly declared the policy behind and intent of those laws:

> It is the public policy of this state that meetings of public bodies be conducted openly and that notices and agendas be provided for such meetings which contain such information as is reasonably necessary to inform the public of the matters to be discussed or decided. Toward this end, any person or entity charged with the interpretations of this article shall construe any provision of this article in favor of open and public meetings.

§ 38-431.09.

¶10        The respondent judge ruled that the District's board had violated § 38-431.01(A) in meetings held between February 8 and May 15, 2002, by improperly conducting its site selection process in executive sessions. The judge also found that the board had violated the open meeting law in meetings conducted between June 13 and September 12, 2002. The District contends the judge abused her discretion in so ruling, noting that she did not explain the basis for it and asserting that the Coalition's interpretation of the statute is erroneous.

¶11        The parties do not dispute that the District meets the definition of "public body" in § 38-431(6) and that its board's legal actions are required to take place in public meetings. Their dispute centers instead around the statutory exceptions to the open meeting law that permit a public body to conduct executive sessions to discuss, consult on, or consider certain subjects, including

6

various personnel matters, information in sealed records, and legal advice. § 38-431.03(A)(1), (2), and (3). The exception at issue here, § 38-431.03(A)(7), provides:

> A. Upon a public majority vote of the members constituting a quorum, a public body may hold an executive session but only for the following purposes:
>
> . . . .
>
> 7. Discussions or consultations with designated representatives of the public body in order to consider its position and instruct its representatives regarding negotiations for the purchase, sale or lease of real property.

¶12      At the outset, we acknowledge that the question of the proper scope of the statutory exception is not an easy one to answer and that competing public interests exist. Members of the public have a right to be present while their governing public bodies debate matters that will significantly affect the public. The decision on where to build a school undoubtedly affects the lives of many people. Yet, the public body is charged with spending the public's money wisely and well. Ultimately, however, we construe the statutory exception narrowly, leaving to the legislature to determine whether the exception should be expanded.

¶13      "Exceptions to the open meeting law 'should be narrowly construed in favor of requiring public meetings.'" Johnson v. Tempe Elem. Sch. Dist. No. 3 Governing Bd., 199 Ariz. 567, ¶14, 20 P.3d 1148, ¶14 (App. 2001), quoting Fisher v. Maricopa County Stadium Dist., 185 Ariz. 116, 123, 912 P.2d 1345, 1352 (App. 1995). A party who asserts that a public body has violated the open meeting laws has the burden of proving that assertion. City of Prescott v. Town of Chino Valley, 166 Ariz. 480, 803 P.2d 891 (1990). But when a party claims a public body held an illegal executive session, the public body must prove that the session was properly conducted under one of the statutory exceptions. Id.

7

¶14    Because the issue before us is a question of statutory construction, our review is de novo. See City of Tucson v. Pima County, 190 Ariz. 385, 949 P.2d 38 (App. 1997). "The most fundamental rule of statutory construction requires us to determine the intent of the legislature." Fisher, 185 Ariz. at 123, 912 P.2d at 1352. "Statutory language is the best indicator of that intent and we will give terms 'their ordinary meanings, unless the legislature has provided a specific definition or the context of the statute indicates a term carries a special meaning.'" Kessen v. Stewart, 195 Ariz. 488, ¶6, 990 P.2d 689, ¶6 (App. 1999), quoting Wells Fargo Credit Corp. v. Tolliver, 183 Ariz. 343, 345, 903 P.2d 1101, 1103 (App. 1995). If we determine that the statutory language is unambiguous, we must apply the language as written, without resorting to the rules of statutory construction. Hayes v. Cont'l Ins. Co., 178 Ariz. 264, 872 P.2d 668 (1994). But, if we determine that the language is subject to more than one reasonable interpretation, we must construe the statute, bearing in mind that, in doing so, we are required to give effect to the legislature's intent in enacting it. Id. "[W]e may also consider the context of the statute and its historical background, subject matter, effects, consequences and purpose." Alaface v. Nat'l Inv. Co., 181 Ariz. 586, 592, 892 P.2d 1375, 1381 (App. 1994).

¶15    Under the plain language of § 38-431.03(A), a public body appropriately holds an executive session when a majority of its members vote during a public meeting to conduct the session for purposes of one of the express exceptions. Under the exception at issue, a public body may hold an executive session to discuss with or consult its designated representatives while considering its position on negotiations to purchase, sell, or lease real property. § 38-431.03(A)(7).

¶16    The key word in dispute is "negotiations." The District argues that the term should be defined broadly, with an eye to common sense and the realities of real estate transactions. As

8

the District interprets the language, the exception applies to "any subject—be it value, location, biology, hydrology, topography or relative humidity—[that] is germane to a discussion" about the District's position on the purchase, sale, or lease of any parcel of real property. The Coalition, however, insists that the exception applies only to existing, ongoing negotiations with a specific property owner about which the public body needs to instruct its representatives or, more specifically, to discussions in which "the public body is determining how much money to offer to a third party to buy, sell or lease real property." In our view, the language is susceptible to more than one reasonable interpretation, requiring us to construe the statutory exception. See Hayes. Therefore, we must determine the legislature's intent in including the word "negotiations," keeping in mind our obligation to construe the exception narrowly.

¶17        According to Black's Law Dictionary 1059 (7th ed. 1999), "negotiation" means "[a] consensual bargaining process in which the parties attempt to reach agreement on a disputed or potentially disputed matter." The dictionary also defines "negotiations" as "[d]ealings conducted between two or more parties for the purpose of reaching an understanding." Id. We agree with the Coalition that the District's interpretation requires us to ignore the word "negotiations." But, we may not construe a statute by omitting any of its words. See State v. Heinze, 196 Ariz. 126, ¶27, 993 P.2d 1090, ¶27 (App. 1999) ("A fundamental principle of statutory construction is to give each section meaning so that no part is rendered void, superfluous, contradictory or insignificant.").

¶18        Conversely, however, we agree with the District that the Coalition's reading of the exception is too narrow and ignores the realities of real estate transactions. Before a public body can instruct its designated representatives about which terms of a proposed transaction it deems most critical, those on which it seeks to stand most firm, and those on which it may be more

9

flexible, the body must first determine for itself what those terms are. Under the Coalition's interpretation, a public body could not retire to an executive session unless it had already commenced negotiating with a property owner or purchaser, apparently, only after having first made public its opening bargaining strategy. Such an interpretation would effectively gut the statutory exception. If we were to construe the statute as the Coalition urges us to do, a public body would be required to have determined and "telegraphed" its position on any real estate transaction before it could ever be permitted to conduct an executive session to consider that position. But, we may not construe a statute in a way that defeats its purpose. See State v. Estrada, 197 Ariz. 383, 4 P.3d 437 (App. 2000), aff'd, 201 Ariz. 247, 34 P.3d 356 (2001); Perez v. Maricopa County, 158 Ariz. 40, 760 P.2d 1089 (App. 1988).

¶19    We find instructive the language of two of the other statutory exceptions in § 38-431.03. See Alaface (statutes may be construed by considering them in context). The first exception permits executive sessions for

> [d]iscussions or consultations with designated representatives of the public body in order to consider its position and instruct its representatives regarding negotiations with employee organizations regarding the salaries, salary schedules or compensation paid in the form of fringe benefits of employees of the public body.

§ 38-431.03(A)(5) (emphasis added). The emphasized language in that subsection is identical to the introductory language in subsection (7). Concluding that a school district could not meet in executive session to determine its position on various aspects of employee salaries and benefits before entering into bargaining talks with organizations representing those employees would render that exception meaningless. A district would be unable to begin negotiating on such topics unless it had first determined its expected revenues and expenses and the areas in which it could adjust either. And no one would expect a district to make its positions on such matters public before it

10

actually commenced those negotiations. See Hokanson v. High Sch. Dist. No. 8, 121 Ariz. 264, 268, 589 P.2d 907, 911 (App. 1978) ("We do not believe the legislature intended on the one hand to authorize a private discussion of personnel matters, and on the other to require a recital of the discussion in public.").

¶20        The second instructive exception authorizes executive sessions for

> [d]iscussion or consultation with the attorneys of the public body in order to consider its position and instruct its attorneys regarding the public body's position regarding contracts that are the subject of negotiations, in pending or contemplated litigation or in settlement discussions conducted in order to avoid or resolve litigation.

§ 38-431.03(A)(4). Under that section, the contracts in question must be "the subject of negotiations," thus implying that negotiations have already begun. That language shows that, when the legislature requires negotiations to be ongoing, it says so. But, because the legislature did not employ that language in the subsection at issue, we cannot conclude that it applies only when express negotiations to purchase or sell property have actually begun.

¶21        As the parties acknowledged at oral argument, no cases in Arizona address the exception for negotiations for the purchase, sale, or lease of real property. The District relies on two cases from other jurisdictions, neither of which is helpful here: Save Our Springs Alliance, Inc. v. Austin Independent School District, 973 S.W.2d 378 (Tex. App. 1998), and Boney Publishers, Inc. v. Burlington City Council, 566 S.E.2d 701 (N.C. Ct. App. 2002). Because the Texas statute at issue in Save Our Springs is so dissimilar to ours, we find the case distinguishable. Texas's statute permits public entities to hold an executive session "to deliberate the purchase, exchange, lease, or value of real property if deliberation in an open meeting would have a detrimental effect on the position of the governmental body in negotiations with a third person." Tex. Code Ann. § 551.072 (Vernon 2003). The exception clause in the Texas statute is broader

11

than ours, and its language is focused on deliberating about purchasing or selling real property rather than upon the negotiations phase like our statute. Thus, we agree with the Coalition that the Texas court's ruling finding permissible the school board's discussions there is not applicable here.

¶22     The statutory exception at issue in Boney Publishers is more similar to Arizona's but also more restrictive. In North Carolina, a public body may conduct a closed session, among other things,

> [t]o establish, or to instruct the public body's staff or negotiating agents concerning the position to be taken by or on behalf of the public body in negotiating (i) the price and other material terms of a contract or proposed contract for the acquisition of real property by purchase, option, exchange, or lease.

N.C. Gen. Stat. § 143.318.11(a)(5) (2003). The court in Boney Publishers suggested that a city council might permissibly meet in closed session to consider acquiring different tracts of land with different owners. But the District acknowledges that the suggestion was dictum; moreover, the suggestion assumed those facts would be material terms of any proposed contract. In addressing the issue actually raised in that case, the court ruled that a closed session is appropriate when a "public body intends to discuss the price to be paid for a particular tract of land, or to discuss other material terms of the contract to purchase the tract which may be subject to negotiation." 566 S.E.2d at 704-05. Thus, as the Coalition points out, the holding in Boney Publishers instead supports its position that executive sessions to consider a public body's position on negotiations to purchase property are appropriate only after the body has determined which parcel it wants to purchase.

¶23     As noted earlier, competing public interests exist in this case. See City of Prescott, 166 Ariz. at 482, 803 P.2d at 893 ("At issue are two competing public policies: the public's interest in the process of government and the need for confidential discussion or consultation for

12

legal advice between a public body and its attorney."); Hokanson, 121 Ariz. at 267, 589 P.2d at 910 ("The public's right to know and to participate in the decision-making process frequently comes into sharp conflict with the need for confidentiality in certain areas."). On the one hand, as the District argues, its board sought to choose a site for its proposed high school without the glare of public scrutiny. The District asserts its board did so in an attempt to avoid having the owner of the site inflate the asking price based on the advantages and disadvantages that the board members might express about all the sites they considered during the selection process. Indeed, the record reflects that, after the board had chosen the Snyder site for the first time in 2000 and asked the SFB to approve it, a third party purchased the property and then demanded a greatly increased price from the District for it. The SFB then rejected the site, and its executive director "vigorously recommend[ed]" that the District's board "discuss all future land acquisition in executive session." The executive sessions at issue occurred after that, when the board again considered the site.

¶24      On the other hand, we note again the declared public policy of the open meeting laws that all legal actions of public bodies be taken in public sessions. § 38-431.01(A). Arizona courts have expressed that policy in various ways since the open meeting laws were adopted. "The intent of the legislature was to open the conduct of the business of government to the scrutiny of the public and to ban decision-making in secret." Karol v. Bd. of Educ. Trustees, 122 Ariz. 95, 97, 593 P.2d 649, 651 (1979). Our supreme court has twice quoted with approval the following language:

> "[A] public meeting presupposes the right of the public freely to attend such meetings with the concurrent right freely to express any approval or disapproval of any action or course about to be taken. Anything which tends to 'cabin, crib or confine' the public in this respect would be destructive of the right . . . ."

13

Washington Sch. Dist. No. 6 v. Superior Court, 112 Ariz. 335, 336, 541 P.2d 1137, 1138 (1975), quoting City of Lexington v. Davis, 221 S.W.2d 659, 661 (Ky. Ct. App. 1949) (emphasis deleted); Town of Paradise Valley v. Acker, 100 Ariz. 62, 65, 411 P.2d 168, 170 (1966); see also Fisher, 185 Ariz. at 123, 912 P.2d at 1352.

¶25        We believe the correct interpretation of the statutory exception lies somewhere in the proverbial middle. Accordingly, we construe the language in subsection (7) as permitting a school district to discuss its position in executive session before it actually commences negotiating with a land owner or purchaser. We are unable to conclude, however, that choosing a site in the first place falls within the statutory exception. Although the District is correct that a public body must choose a site before it can begin negotiating to purchase or lease the site, nothing in subsection (7) permits a public body to convene in executive session to discuss selecting a site on which to construct a new school. For that discussion, we find applicable the following statement by our supreme court in Karol:

> We do not believe, in order to conduct a meeting openly, the public body need disclose every fact, theory, or argument pro or con raised in its deliberations, or every detail of the recommended decision on which a vote is about to occur. On the other hand, we would not find acceptable a public body calling for vote a recommended action designated only by number, thereby effectively hiding its actions from public examination. We believe therefore that the stated intent of the statute requires that all legal actions be preceded . . . by disclosure of that amount of information sufficient to apprise the public in attendance of the basic subject matter of the action so that the public may scrutinize the action taken during the meeting . . . .

122 Ariz. at 98, 593 P.2d at 652. Or, as Division One of this court succinctly put it: "It is the debate over what action to take, including the pros and cons and policy implications, of competing

alternative courses of action, that must take place in public." Fisher, 185 Ariz. at 124, 912 P.2d at 1353.

¶26 Admittedly, we have no bright-line test for determining the point at which an executive session becomes permissible. Such determinations undoubtedly must be reached on a case-by-case basis. Under the facts of this case, however, we conclude, as a matter of law, that the District's board crossed the line and that, therefore, the respondent judge did not abuse her discretion in finding that the board had violated the open meeting laws by conducting the site selection process for its proposed high school in executive session.

### Ratification

¶27 The District argues, however, that its board ratified the selection of the Snyder site at a public meeting held May 29, 2003, after the respondent judge ruled that the board had violated the open meeting laws. The District presented evidence about its compliance with the statutory requirements for ratification and the action the board took in that meeting in a motion for reconsideration filed after the judge had granted summary judgment in favor of the Coalition. The respondent judge denied the motion without comment, but in denying a related motion, ruled that the ratification attempt was untimely. We find she abused her discretion in doing so. See Twin City.

¶28 Section 38-431.05(A) provides that any legal action a public body takes in violation of the open meeting laws is void "except as provided in subsection B." Subsection (B) provides:

> A public body may ratify legal action taken in violation of this article in accordance with the following requirements:
>
> 1. Ratification shall take place at a public meeting within thirty days after discovery of the violation or after such discovery should have been made by the exercise of reasonable diligence.

15

2. The notice for the meeting shall include a description of the action to be ratified, a clear statement that the public body proposes to ratify a prior action and information on how the public may obtain a detailed written description of the action to be ratified.

3. The public body shall make available to the public a detailed written description of the action to be ratified and all deliberations, consultations and decisions by members of the public body that preceded and related to such action. The written description shall also be included as part of the minutes of the meeting at which ratification is taken.

4. The public body shall make available to the public the notice and detailed written description required by this section at least seventy-two hours in advance of the public meeting at which the ratification is taken.

In its response to the special action petition, the Coalition does not dispute that the District's board met the requirements of (2), (3), and (4). Instead, it contends the board's vote on May 29, 2003, to ratify its decision of May 15, 2002, was untimely. We disagree.

¶29        The Coalition first argues that, as a matter of law, the District's board members could not have had a good faith basis for believing its executive sessions had complied with the open meeting laws because they knew there were no ongoing negotiations to purchase any of the sites the board had been considering. Although we question whether a court can determine a person's subjective bad faith as a matter of law, we need not address that issue because we find no merit to the Coalition's argument. As both parties have acknowledged, no previous Arizona case has addressed the statutory exception at issue and its scope. Moreover, we have already demonstrated that reasonable minds can differ on the meaning and applicability of subsection (7). That negotiations were not actually occurring, therefore, does not require us to determine, as a matter of law, that the board members should have discovered "by the exercise of reasonable diligence" that they had violated the open meeting laws. § 38-431.05(B)(1).

16

¶30 Nor do we agree with the Coalition that the discovery clause in subsection (B)(1) of the ratification statute was triggered by the letter its attorneys sent the District's board on October 23, 2002. Taken to its logical conclusion, the Coalition's theory would be unworkable and could bring the business of a public body to a standstill. If members of a public body can be said, as a matter of law, to have actually or constructively discovered they have violated the open meeting laws based only on receiving a letter from an attorney setting forth "the facts and the legal bases for concluding" that such a violation has occurred, then any disgruntled person could require any public body to ratify every legal action the body takes simply by hiring a lawyer to send a letter. We cannot conclude that the opinion of the Coalition's attorneys that the board had violated the open meeting laws triggered the ratification discovery clause. For the same reasons, we reject the respondent judge's comment that the board knew or should have known it had violated the law "no later than" the date the Coalition filed its lawsuit.

¶31 Finally, we find inapplicable the Coalition's analogy to the discovery rule in tort litigation. Under that rule, a plaintiff's "cause of action does not accrue until the plaintiff knows or with reasonable diligence should know the facts underlying the cause." Doe v. Roe, 191 Ariz. 313, ¶29, 955 P.2d 951, ¶29 (1998). The statutory limitation period thus begins when a plaintiff knows or should know sufficient facts to identify that a wrong occurred and caused injury. Walk v. Ring, 202 Ariz. 310, 44 P.3d 990 (2002). If the plaintiff fails to file a lawsuit within the applicable period, the action is time barred and subject to dismissal on that ground. See Doe. But in tort cases, the date on which the plaintiff knew or should have known he or she has been damaged as a result of someone else's tortious conduct is the date on which the statutory limitation period begins. In this case, the unknown quantity was not the date the board members knew, but the applicable legal rule. Unlike the question of the date when a plaintiff knew or should have

known "facts underlying the cause," id. at ¶29, a matter that may raise questions of fact for a trier of fact, id., the question here was a legal question. Because no Arizona case had determined the meaning and applicability of the statutory exception at issue at the time of the respondent judge's ruling, we cannot say as a matter of law that the District's board had discovered or should have discovered before that time that its executive sessions had violated the open meeting laws.

¶32        Indeed, the Coalition implicitly, although probably unintentionally, recognizes this in its response to the District's petition for special action. The Coalition argues that the District's board should not have presumed it had complied with the open meeting laws "since a court is the final arbiter of that question, not the District, its attorneys, or the SFB's attorneys." The reverse of that proposition is also true. The District's board was not required to presume that it had violated the open meeting laws simply because the Coalition had asserted it had "since a court is the final arbiter of that question." Moreover, if public bodies must interpret the law as requiring open meetings if they have any doubt about the laws' application, as the Coalition contends, then the statutory exceptions become meaningless and the ratification statute useless. As we have already noted, we may not construe statutes in a way that renders any portion superfluous, void, or insignificant. Heinze.

¶33        The Coalition also argues that the board could not ratify its actions by a single vote selecting the Snyder site and directing its attorneys to file a condemnation action to acquire the site because, it claims, the entire site selection process was improperly conducted in executive session. The Coalition bases that argument on the respondent judge's conclusion that all legal actions the board had taken between February 8 and September 12 pertaining to the high school and the Snyder site were void. We disagree. Nothing in the ratification statute requires a public body to repeat an entire process improperly conducted in executive session. Moreover, the board's vote

18

to build the school on the Snyder site was not made in executive session. Instead, its violation was in conducting the site selection process in executive session. Therefore, the board could properly ratify by a single vote the legal action that had resulted from that process.

¶34    We also find no support for the Coalition's argument in the cases on which it relies. Because Cooper v. Arizona Western College District Governing Board, 125 Ariz. 463, 610 P.2d 465 (App. 1980), was decided before the ratification provision was adopted in 1982, see 1982 Ariz. Sess. Laws, ch. 278, § 2, its statement on affirmance does not apply to a question on ratification. The issue in McComas v. Board of Education, 475 S.E.2d 280 (W. Va. 1996), was whether a "meeting," as defined by the statute, had occurred. In affirming the trial court's conclusion that the public vote was void, the appellate court did not rule that the board could not ratify its actions; the court simply affirmed the consequences the trial court had imposed on the board for conducting a meeting in violation of the statute. The same is true in Town of Palm Beach v. Gradison, 296 So. 2d 473 (Fla. 1974). The issue there was whether a citizens' planning committee was required to comply with the open meeting law; no issue of ratification was involved. Although the court held in Board of Education School District No. 67 v. Sikorski, 574 N.E.2d 736 (Ill. App. Ct. 1991), that the school board in that case had ratified its action taken in violation of the open meetings act, we find the reasoning unhelpful because there is no ratification provision in the Illinois statutes. See 5 Ill. Comp. Stat. 120/1 through 120/6 (2003).

¶35    Because we find no merit to the Coalition's arguments that the board's ratification of its selection of the Snyder site was either untimely or ineffective, we conclude that the respondent judge abused her discretion in denying the District's motion for reconsideration. And, because we conclude the board timely ratified its selection of the Snyder site, we need not address any of the District's arguments about the relief the respondent judge granted the Coalition,

19

including her determination that the board's selection of the Snyder site was void, that the action to condemn the Snyder site was void ab initio, and that the transfer of title to the District of the site was void.

## The SFB's Authority to Pay Severance Damages

¶36    Although the Coalition had dismissed the SFB from the lawsuit, the respondent judge nevertheless addressed the issue of whether SFB funds can be used to pay severance damages in a condemnation action. The judgment permanently enjoins the District from using SFB funds to pay severance damages in any condemnation action it may file to acquire a high school site. Although we question the wisdom of determining the authority of a state agency in its absence, we address the issue because the SFB has filed an amicus curiae brief in this special action.

¶37    The SFB was created as part of the Students FIRST Act, the legislature's response to our supreme court's ruling in Roosevelt Elementary School District No. 66 v. Bishop, 179 Ariz. 233, 877 P.2d 233 (1994), that the state's system for financing schools was unconstitutional. See Hull v. Albrecht, 192 Ariz. 34, 960 P.2d 634 (1998); 1998 Ariz. Sess. Laws. 5th Spec. Sess., ch. 1; see also Roosevelt Elem. Sch. Dist. No. 66 v. State, ___ Ariz. ___, 74 P.3d 258 (App. 2003). In the Act, the legislature established three funds the SFB administers, the Deficiencies Correction Fund, the Building Renewal Fund, and the New School Facilities Fund. A.R.S. §§ 15-2021, 15-2031, and 15-2041. As the SFB points out, although the judgment refers to SFB funds in general, the only fund applicable in this case is the New School Facilities Fund.

¶38    Section 15-2041 requires the SFB to project future enrollments for schools and to distribute state funds to school districts under prescribed formulas with the goal of achieving "minimum adequate facility standards" for schools throughout the state. Hull, 192 Ariz. 34, ¶8,

20

960 P.2d 634, ¶8. The first sentence of subsection (F) is the one at issue. Pertinent portions of that subsection provide:

> The school facilities board shall distribute the monies needed for land for new schools so that land may be purchased at a price that is less than or equal to fair market value and in advance of the construction of the new school. If necessary, the school facilities board may distribute monies for land to be leased for new schools if the duration of the lease exceeds the life expectancy of the school facility by at least fifty per cent. The proceeds derived through the sale of any land purchased or partially purchased with monies provided by the school facilities board shall be returned to the state fund from which it was appropriated and to any other participating entity on a proportional basis. If a school district acquires real property by donation at an appropriate school site approved by the school facilities board, the school facilities board shall distribute an amount equal to twenty per cent of the fair market value of the donated real property that can be used for academic purposes. The school district shall place the monies in the unrestricted capital outlay fund and increase the unrestricted capital outlay limit by the amount of monies placed in the fund. Monies distributed under this subsection shall be distributed from the new school facilities fund.

§ 15-2041(F).

¶39        Observing that a school district is a legislative creation with only the powers the legislature has granted it, the respondent judge ruled as follows:

> [The Coalition's] second argument is that A.R.S. §15-2041(F) does not permit the payment of severance damages with School Facilities Board funds . . . . A literal reading of the statute forces the Court to agree. Severance damages are often, but not always, a component of condemnation actions. However, fair market value and severance damages are calculated separately and are defined in separate jury instructions in such cases. A.R.S. §12-1122(A)(3) and (4). While the reality is that fair market value contemplates severance damages, they are not one and the same. . . . Neither side disputes that, on its face, [§ 15-2041(F)] does not refer to severance damages, attorneys fees, or other expected costs which might result from the purchase of land. Because the legislature was quite clear in limiting the use of SFB funds to—at a minimum—"fair market value", the Court is unwilling to interpret this subsection i[n] such a way that the limited resources

21

of the SFB might be subject to other unspecified costs inherent in the purchase of land. School districts wishing to purchase or pursue condemnation of land that involves severance damages are not precluded from doing so. They are simply not able to avail themselves of SFB funds in order to purchase such land.

¶40 We disagree with the respondent judge's interpretation of the statute for several reasons. First, the statute cannot be applied literally because it does not even mention condemnation actions. That reason alone renders the statute ambiguous, requiring us to construe it. See Hayes. Second, reading the statute in context to determine the legislature's intent compels us to conclude that it encompasses acquiring property by eminent domain even when severance damages are involved. Finally, unlike the respondent judge's interpretation, the practical consequences of our interpretation comport with the supreme court's mandate in Roosevelt. We examine each of those reasons in depth.

¶41 Initially, as noted above, the language at issue speaks only of purchasing property; it does not mention acquiring property through eminent domain. Other portions of subsection (F) refer to leasing property and acquiring property by donation. If we were to apply the statute as it is literally written, therefore, we would have to conclude that subsection (F) does not even apply to property acquired by eminent domain.

¶42 In addition, the language in question reads "so that land may be purchased." § 15-2041(F). The statute states that the SFB "shall distribute the monies needed." Id. But it does not state that land "shall be purchased" at a price "less than or equal to fair market value." Id. Instead, it provides that land "may be purchased." Id. (emphasis added). Appellate courts have on occasion construed "may" to mean "shall" in certain contexts. See Frye v. South Phoenix Volunteer Fire Co., 71 Ariz. 163, 224 P.2d 651 (1950); Pioneer Mut. Benefit Ass'n v. Corp. Comm'n, 59 Ariz. 112, 123 P.2d 828 (1942). But that is not the case when the legislature has

22

employed both "shall" and "may" in the same paragraph. State v. Old West Bonding Co., 203 Ariz. 468, ¶23, 56 P.3d 42, ¶23 (App. 2002) ("[t]o give meaningful effect to both" subsections of rule, one of which used "shall" and the other "may," court "construe[d] the word 'may' . . . as having its usual discretionary meaning"); HCZ Constr., Inc. v. First Franklin Fin. Corp., 199 Ariz. 361, ¶15, 18 P.3d 155, ¶15 (App. 2001) ("When the Legislature has used both 'may' and 'shall' in the same paragraph of a statute, we infer that the Legislature acknowledged the difference and intended each word to carry its ordinary meaning."); In re Guardianship of Cruz, 154 Ariz. 184, 741 P.2d 317 (App. 1987) ("shall" and "may" appeared in same paragraph of statute; court applied statute as written). In this case, because the legislature used both words in the same sentence, we apply "may" as written.

¶43        In addition, because condemnation actions are not mentioned in § 15-2041, nothing in the statute connects the term "fair market value" to condemnation actions. "Fair market value" is a term used in property transactions in general; it is also employed in criminal proceedings and tax cases. See In re Krohn, 203 Ariz. 205, 52 P.3d 774 (2002) (mortgage foreclosure sale may be set aside if bid is grossly inadequate when compared to fair market value of property); Bus. Realty of Ariz., Inc. v. Maricopa County, 181 Ariz. 551, 892 P.2d 1340 (1995) (for tax purposes, Arizona assesses property at full cash value, which is generally fair market value); Swanson v. Safeco Title Ins. Co., 186 Ariz. 637, 925 P.2d 1354 (App. 1995) (title policy insured's measure of damages was property's fair market value without title defect less fair market value with defect); State v. Ellis, 172 Ariz. 549, 550, 838 P.2d 1310, 1311 (App. 1992) (in determining restitution for stolen property, "the measure of the victim's full economic loss is the fair market value"); Rogers v. Feltz, 163 Ariz. 462, 788 P.2d 1213 (App. 1989) (tenant entitled to terminate lease for landlord's breach may recover as damages fair market value of lease as of termination date);

23

Farmers Ins. Co. of Ariz. v. R.B.L. Inv. Co., 138 Ariz. 562, 564, 675 P.2d 1381, 1383 (App. 1983) ("[T]he measure of compensation to the owner of a negligently damaged motor vehicle may include the cost of repair and proven residual diminution in fair market value.").

¶44            Moreover, as the District points out, the condemnation statute itself does not contain the term "fair market value." It uses the term "value." A.R.S. § 12-1122(A)(1) ("The court or jury shall ascertain and assess: 1. The value of the property sought to be condemned."). We acknowledge that the definition of "value" in § 12-1122(C) is quite similar to the term "fair market value" as defined in case law. See Krohn; Farmers Ins. Co. We also note, however, that statutory definitions of "fair market value" vary, depending on the type of property involved and the nature of the proceeding. See A.R.S. §§ 12-1566(C) (proceedings to enforce judgments for debts secured by real property); 13-1801(15) (defining "value" as fair market value of property or services that have been stolen); 43-1089.02 (for tax purposes, fair market value of property donated is as determined in certified appraisal as defined in A.R.S. § 32-3601); 44-5501(D) (defined in context of consumer credit sales).

¶45            In short, nothing about the term "fair market value" limits its use to condemnation proceedings. Thus, our examination of the language of the statute supports the conclusion that SFB funds may be used to pay severance damages in a condemnation action. Our examination of the context of the statute reinforces that conclusion. Subsection (C) of § 15-2041 requires a school district to submit to the SFB a plan for a new school or an addition to an existing school and directs it to "request monies from the new school facilities fund for the new construction or land." But it does not limit use of those monies to land acquired only by purchase or by a condemnation action that does not include the payment of severance damages. And A.R.S. § 15-2051(A)(1)(a) authorizes the SFB to issue negotiable revenue bonds to pay the cost of "[a]cquiring real property

and constructing new school facilities as provided by § 15-2041." Section 15-2051 also contains no limitation on obtaining land through condemnation actions in which severance damages are involved. In addition, it speaks of "acquiring" land, not simply purchasing it. The same is true of A.R.S. § 15-2066(B), which provides:

> The validity of bonds issued under this article does not depend on and is not affected by the legality of any proceeding relating to any action by the school facilities board in granting or lending monies or the acquisition, construction or improvement of any facility paid with monies provided by the board.

(Emphasis added.)

¶46        Furthermore, the Students FIRST Act itself contains a statement about the SFB's purpose, which reads as follows: "The purpose of the school facilities board is to evaluate the school capital needs of school districts and to distribute monies to school districts in order to cure existing deficiencies, for building renewal and for the construction of new facilities." 1998 Ariz. Sess. Laws 5th Spec. Sess., ch. 1, § 47. We find no legislative intent in the context of the statute to limit payments from the New School Facilities Fund to properties acquired only by purchase or by condemnation actions that do not include an award of severance damages.

¶47        Finally, because we must, "[i]f possible, . . . construe a statute so that it will be constitutional," Blake, 202 Ariz. 120, ¶10, 42 P.3d 6, ¶10, we must remain mindful of the practical consequences of our construction. In her ruling, the respondent judge noted that school districts that must file a condemnation action in order to acquire the land on which to build a school are not prohibited from paying severance damages; they simply must use funds other than SFB funds to do so. As the SFB points out, that interpretation of the statute would eventually result in returning Arizona's school financing system to the system our supreme court found unconstitutional in Roosevelt. Or, as the District puts it: "It does not make sense for the legislature to have created

25

the SFB to fund property acquisition centrally and uniformly, but restricted the SFB from paying those damages necessarily declared by a court to be just and necessary compensation in a particular case."

¶48	Our interpretation, on the other hand, is consistent with the mandate in Roosevelt that "the system the legislature chooses to fund the public schools must not itself be the cause of substantial disparities." 179 Ariz. at 242, 877 P.2d at 815. It is also consistent with the supreme court's statement in Hull that, "'[o]nce a standard is set, the legislature must choose a funding mechanism that does not cause substantial disparities and that ensures that no school in Arizona falls below the standard.'" 192 Ariz. 34, ¶8, 960 P.2d 634, ¶8, quoting Hull v. Albrecht, 190 Ariz. 520, 524, 950 P.2d 1141, 1145 (1997). A school district with an insufficient tax base to raise enough money to pay for severance damages to acquire perhaps the only available land on which to build a school would soon fall below the standards set in the Students FIRST Act. We are unable to conclude that the legislature struggled so long to create a statewide system for financing new schools that did not include every possible method by which a school district may obtain real property, including a condemnation action that involves an award of severance damages. See Hull, 192 Ariz. 34, ¶2, 960 P.2d 634, ¶2 ("This is the fourth time this litigation has required us to decide whether the legislature has met the mandate of the Arizona Constitution to provide a general and uniform public school system.").

Disposition

¶49	Our conclusion that the District is not prohibited from using SFB funds to pay severance damages in a condemnation action to acquire the Snyder site renders moot the respondent judge's ruling that the District's May 2001 election did not authorize it to purchase the site with its own funds. Although we agree that the District's board violated the open meeting law

26

as, we reverse the respondent judge's rulings that the board's ratification of its selection of the Snyder site was untimely and that the District may not use SFB funds to pay severance damages. Accordingly, we vacate the judgment and remand the case for further proceedings consistent with this opinion.

_____
PHILIP G. ESPINOSA, Chief Judge

CONCURRING:


_____
JOHN PELANDER, Presiding Judge


_____
PETER J. ECKERSTROM, Judge