NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JANEL RAINER, wrongful death statutory beneficiary, for and on behalf
of herself and survivors of her husband,
decedent CHRISTOPHER RAINER,
*Plaintiff/Appellant*,

*v.*

SWIFT TRANSPORTATION COMPANY OF ARIZONA, LLC, et al.,
JAMES M. KURBAT, M.D. and MARGARET ELLEN KURBAT, Husband
and Wife[1],
*Defendants/Appellees*.

No. 1 CA-CV 15-0080
FILED 10-11-2016

Appeal from the Superior Court in Maricopa County
Nos. CV2009-032279, CV2011-015216 (Consolidated)
The Honorable Lisa Daniel Flores, Judge

**AFFIRMED**

COUNSEL

Treon & Shook, P.L.L.C., Phoenix
By Daniel B. Treon
*Counsel for Plaintiff/Appellant*

---

[1]    On the court's own motion, it is ordered amending the caption in
this appeal as reflected in this decision.  The above referenced caption shall
be used on all further documents filed in this appeal.

Jones, Skelton & Hochuli, P.L.C., Phoenix
By Phillip H. Stanfield, Jonathan P. Barnes and Jason P. Kasting
*Counsel for Defendant/Appellee Swift Transportation Company of Arizona, LLC*

Bonnett Fairbourn Friedman & Balint, PC, Phoenix
By William G. Fairbourn, Jonathan S. Wallack and Laura Van Buren
*Counsel for Defendant/Appellee James M. Kurbat, M.D.*

---

## MEMORANDUM DECISION

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Maurice Portley joined.

---

**B R O W N**, Presiding Judge:

¶1        Janel Rainer ("Rainer") appeals the trial court's order granting summary judgment in favor of Swift Transportation Co. of Arizona, LLC. ("Swift") and James M. Kurbat, M.D. and Margaret Ellen Kurbat (collectively "the Kurbats"), based on Rainer's failure to sue Swift and the Kurbats within the applicable statute of limitations. For the following reasons, we affirm.

## BACKGROUND

¶2        On October 24, 2007, Rainer's husband, Christopher ("decedent"), died from injuries suffered after his car collided with a delivery truck owned by Swift Charities for Children ("SCC") and driven by its recently-hired employee, Juan Sanchez-Valdez ("Sanchez-Valdez"). On March 20, 2008, Rainer's counsel sent SCC a certified 17-page letter referencing the accident and requesting, *inter alia*, that SCC preserve and produce all of the documents listed in the letter, including Sanchez-Valdez's "Driver's Qualification File" and "Personnel File." In pertinent part, the letter requested (1) all medical examinations, drug tests and certification of medical examinations; and (2) any and all completed applications for employment; all actual driver's motor carrier road and written tests administered; all road and written test certificates, regardless of the date; and all past employment inquiries sent to or secured from former employers along with all responses received. The letter also referenced the Federal Motor Carrier Safety Regulations ("FMCSR"), stating that the FMCSR required SCC to maintain a Driver's Qualification File for each driver.

¶3            On March 31, 2008, SCC's counsel acknowledged receipt of the letter, stating that he would like to speak to Rainer's counsel about the letter at his "earliest convenience," and that if it would be "more convenient to set aside a specific time," arrangements could be made.  By his own admission, Rainer's counsel did not reply or otherwise seek to contact SCC's counsel about the March 31 response.

¶4            On May 28, 2008, Rainer's counsel received a "Fatal Traffic Collision Report" from the Glendale Police Department.   The report showed that officers believed decedent "failed to stop for a red traffic light" and collided with Sanchez-Valdez, and identified at least two witnesses who observed decedent enter the intersection against a red light.  The report also indicated that while interviewing Sanchez-Valdez at the scene of the accident, Officer Rico noticed Sanchez-Valdez had a "sleepy left eye."   In response to questioning, Sanchez-Valdez replied that he injured his left eye ten years earlier, which required surgery.  Sanchez-Valdez stated he could still see out of his left eye, but that he did not see the decedent's car before the collision.  Sanchez-Valdez provided officers with his Class D Arizona driver's license, which was issued three years prior to the accident and gave no indication he was subject to any restrictions, including corrective lenses.

¶5            The SCC truck's registration listed its weight at 26,000 pounds.   Officer Trier noted that this kept the vehicle out of the "commercial vehicle" range and that a Class D driver's license was sufficient to operate a truck in that weight range.  During a subsequent accident investigation, Detective Quigley requested that the Arizona Motor Vehicle Division ("MVD") Medical Review Program conduct a "medical review" of Sanchez-Valdez's vision because she was concerned that he never saw decedent's car before the impact.  Quigley subsequently learned from MVD that Sanchez-Valdez's vision was adequate for a Class D license and notified Rainer of such in June 2008.

¶6            On October 23, 2009, Rainer filed a wrongful death action against Sanchez-Valdez for negligence and against SCC for negligent hiring and vicarious liability, alleging in part that Sanchez-Valdez's "vision, and therefore his ability to observe oncoming traffic, was impaired due to a medical condition."  She did not serve the complaint until January 21, 2010.  SCC and Sanchez-Valdez answered, then served their initial disclosure statements on June 15, 2010, and disclosed SCC's "file concerning Juan Sanchez-Valdez," who had worked for SCC less than one month prior to the accident.  The file contained:  (1) a Department of Transportation Medical Examination Report ("DOT Medical Report") signed by Dr. Kurbat on October 2, 2007, evidencing he performed a medical examination of

Sanchez-Valdez on that date and noted an "eccentric" left pupil secondary to trauma; (2) Dr. Kurbat's signed certification dated October 2, 2007 that Sanchez-Valdez was fit to be a commercial driver as defined by the FMCSR; (3) Section 3 of the DOT Medical Report indicating Sanchez-Valdez had a vision examination on October 11, 2007 for clearance to drive a truck for SCC, which was performed and signed by an optometrist; and (4) a prescription written on the optometrist's letterhead requiring that Sanchez-Valdez wear eye glasses full-time.

¶7         In January 2011, Rainer deposed Sanchez-Valdez. After approval by the court, Rainer filed an amended complaint in September 2011, adding Swift, the Kurbats, and several other defendants who were subsequently dismissed from the litigation.[2] Rainer's amended complaint alleged medical malpractice against Dr. Kurbat, negligent hiring and vicarious liability against Swift, and negligence *per se* against all defendants. Rainer alleged that Dr. Kurbat was not qualified to conduct commercial driver fitness examinations and, in particular, eye examinations. Rainer also alleged Swift was negligent for hiring a physician who was not qualified to conduct medical examinations for its drivers to determine their fitness.

¶8         After considering separate motions for summary judgment filed by Swift and the Kurbats, the trial court ruled that: (1) the statute of limitations accrued no later than May 28, 2008, based on the discovery rule, because when Rainer received the police report, she was "on notice that [Sanchez-Valdez's] vision was an issue and [she] had a duty to reasonably investigate any potential claims based on his vision;" (2) Rainer "failed to diligently investigate her claims;" (3) the two-year statute of limitations expired on May 28, 2010; and (4) Rainer's claims against Swift and the Kurbats were time-barred. This appeal followed.

## DISCUSSION

¶9         Rainer argues the trial court erred in granting summary judgment, asserting that when her claims accrued and whether she diligently investigated are jury questions.

¶10         Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment

---

2         Rainer's claims against Sanchez-Valdez and SCC were eventually dismissed pursuant to a settlement.

as a matter of law. Ariz. R. Civ. P. 56(a). We determine de novo whether any genuine issue of material fact exists and whether the trial court erred in application of the law. *Logerquist v. Danforth*, 188 Ariz. 16, 18 (App. 1996). We construe the evidence and reasonable inferences in the light most favorable to the non-moving party. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 482, ¶ 13 (2002) (citation omitted). And, we will uphold the trial court's ruling if correct for any reason. *Logerquist*, 188 Ariz. at 18.

**¶11** A complaint for personal injury must be filed within two years after the cause of action accrues. Arizona Revised Statutes ("A.R.S.") section 12-542. Under the common law discovery rule, accrual occurs "when the plaintiff knew or by the exercise of reasonable diligence should have known of the defendants' conduct." *Wyckoff v. Mogollon Health All.*, 232 Ariz. 588, 591, ¶ 9 (App. 2013) (internal quotations and citation omitted). Courts typically apply the discovery rule when the "injury or the act causing the injury, or both, have been difficult for the plaintiff to detect." *ELM Ret. Ctr., LP v. Callaway*, 226 Ariz. 287, 290, ¶ 12 (App. 2010) (citing *Gust, Rosenfeld & Henderson v. Prudential Ins. Co.*, 182 Ariz. 586, 589 (1995)). Although knowledge of all the underlying facts is not necessary, the plaintiff "must at least possess a minimum requisite of *knowledge sufficient to identify that a wrong occurred and caused injury*." *Walk v. Ring*, 202 Ariz. 310, 316, ¶ 22 (2002) (citation omitted). A plaintiff must also have a "reason to connect the 'what' to a particular 'who' in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault." *Id.*

**¶12** Generally, determining when a plaintiff learned of defendant's conduct, thereby triggering accrual of a cause of action, is a question of fact for a jury, and summary judgment is appropriate only if failing to investigate potential claims is not reasonably justified. *Id.* at 316, ¶ 23. Yet, a party may not "hide behind its ignorance when reasonable investigation would have alerted it to the claim." *ELM*, 226 Ariz. at 290, ¶ 12 (citing *Doe v. Roe*, 191 Ariz. 313, 324, ¶ 37 (1998) (explaining that plaintiffs have an affirmative duty of due diligence when investigating potential claims)). The key question in applying the discovery rule is "whether a reasonable person would have been on notice to investigate," and plaintiffs are not relieved of their affirmative duty to "*timely inquire whether any basis exists for legal action*." *Walk*, 202 Ariz. at 316-17, ¶¶ 24-25 (emphasis added).

**¶13** Here, Rainer did not seek to add Swift and the Kurbats until almost four years after the accident, which means her claims against them are barred unless under the discovery rule the time for filing suit against

them was tolled. As the plaintiff, Rainer has the burden of proving that the discovery rule should apply to delay accrual, as well as refuting a *prima facie* case for summary judgment by showing that available, competent evidence justifies a trial. *See Ulibarri v. Gerstenberger*, 178 Ariz. 151, 155 (App. 1993). Thus, we must determine whether Rainer has established the existence of material issues of fact that she timely inquired as to whether there was a basis for suing Swift and the Kurbats.

## I.    Diligent Investigation

¶14        Rainer argues she diligently investigated her claims, and was aware there could be "vision" issues at play, but that her investigation revealed no vision *examination* issues, thereby connecting the 'what' (medical negligence and negligent hiring) to a particular 'who' (Swift and the Kurbats). As such, she maintains she was not on notice to investigate Swift and Dr. Kurbat until she received SCC's initial disclosures in June 2010.

¶15        On March 20, 2008, Rainer's counsel sent SCC the 17-page letter requesting numerous documents, including Sanchez-Valdez's Driver's Qualification File pursuant to the FMCSR. SCC's counsel replied, asking to speak to Rainer's counsel about the request. Rainer's counsel, however, did not respond or otherwise attempt to obtain the file. Two months later, on May 28, 2008, Rainer's counsel received the police report, which revealed potential concerns about Sanchez-Valdez's vision: (1) he had a "sleepy left eye," which was previously injured and required surgery; (2) he told officers he did not see decedent's car before the collision; and (3) Officer Quigley was concerned enough to request an MVD review. The police report also stated that Sanchez-Valdez told officers he worked for SCC, and the SCC truck he was driving, which was referred to throughout the report as the "Swift" truck or "Swift Transportation" truck by both officers and witnesses, weighed 26,000 pounds, for which a commercial driver's license ("CDL") was not necessary.

¶16        Rainer asserts that the March 2008 letter was merely a "form" letter, sent as a precautionary measure, as she did not know if the FMCSR applied to SCC. Rainer argues that once she received the police report in May 2008, and learned the truck was not in the commercial vehicle range for which a CDL was required, she knew three key points: (1) the FMCSR did not apply to SCC; (2) SCC would not have the Driver Qualification File she requested; and (3) it was pointless to respond to SCC's counsel's letter of March 31, 2008. We are not persuaded by these assertions.

¶17      First, the FMCSR applies to all employers who transport property or passengers in interstate commerce in a commercial motor vehicle weighing 10,001 pounds or more. FMCSR §§ 390.3(a), 390.5. Those employers must maintain a Driver Qualification File for each driver, including medical certifications. FMCSR § 391.51. As stated in Rainer's March 20, 2008 correspondence to SCC, the FMCSR requires it to "secure and maintain possession" of documents in Sanchez-Valdez's Driver's Qualification File, including medical examinations. Sanchez-Valdez was not required to possess a CDL, because the truck weighed less than 26,001 pounds. FMCSR §§ 383.5, 390.3(b). Thus, a Class D license was sufficient. A.R.S. § 28-3101(2)(a).

¶18      Rainer argues SCC is not a "federal motor carrier" because it does not transport "interstate" and labels the SCC truck as an "in-town" truck. However, she does not identify where she raised this point to the trial court nor does she point to any evidence supporting the assertion that SCC was not a federal motor carrier. Rainer states that after learning about trucking law from a trucking expert, she deduced that SCC was not subject to the FMCSR because the truck was utilized as a local delivery truck. Even so, Rainer did not consult with a trucking expert until early 2009, and by her own admission, they only discussed "how [Sanchez-Valdez] drove the truck," as well as whether any "additional duties of care" existed for non-CDL drivers. Nothing in the record indicates Rainer and the trucking expert discussed the applicability of the FMCSR.

¶19      Second, even assuming SCC was not subject to the FMCSR, and regardless of whether SCC kept a Driver Qualification File, it is clear that SCC maintained certain records for Sanchez-Valdez, including the medical information provided with the initial disclosure statement. The medical information was precisely the type of information Rainer sought in her March 20 letter. Thus, regardless whether Rainer believed the FMCSR applied to SCC, no reasonable person in Rainer's position, conducting a diligent investigation of her potential claims, would have failed to follow-up on SCC's counsel's invitation to discuss the letter.

¶20      Third, Rainer maintains that the police report's references to Sanchez-Valdez's eyesight indicated only that poor vision may have contributed to the accident, and that the investigative lead provided by the police report was foreclosed once Rainer learned that Sanchez-Valdez's vision was adequate for a Class D license. She thus argues there was no way, short of litigation, to learn about Dr. Kurbat's examination of Sanchez-Valdez because the police report did not mention Dr. Kurbat or Swift or mention that Valdez had a recent eye examination. According to Rainer, it

was not until SCC's initial disclosures in June 2010 — during litigation — that she was alerted to a potential medical malpractice claim.

¶21 Again, armed with the multiple vision concerns highlighted in the police report, if Rainer had followed-up with SCC's counsel, she would have discovered several key facts; that Sanchez-Valdez was recently hired by SCC and recently had a medical examination, including an eye examination, and that Swift provided the medical examinations for SCC drivers. These facts provided a basis for further investigation in the effort to connect the 'what' (medical malpractice and negligent hiring) with the 'who' (Swift and the Kurbats). And, if SCC's counsel refused to provide the file in response to the March 20 letter, then Rainer could have documented that refusal as part of her investigation, and pursued other alternatives for obtaining the records after the lawsuit was filed. To simply assume that her 17-page request for production of information would have borne no fruit, based on the supposed inapplicability of federal regulations and the absence of clues of an eye examination in the police report, ignores a plaintiff's obligation to reasonably investigate potential claims within the statute of limitations.

¶22 Fourth, Rainer's original complaint alleged that SCC was liable for negligently hiring Sanchez-Valdez because he was not "qualified, trained, or supervised" to safely operate a delivery truck and that SCC knew or should have known that his unsafe operation of the truck could injure other motorists. To support such a claim, we presume that Rainer had "knowledge, information, and belief formed after reasonable inquiry" that her claim was "well grounded in fact" and "warranted by existing law." Ariz. R. Civ. P. 11(a). Records that would bear on the issue of negligent hiring would include tests, certifications, and training Sanchez-Valdez was required to complete, and Rainer's counsel in fact requested those specific records in his March 20 letter to SCC. Again, no reasonable person in Rainer's position would have failed to follow-up on the March 20 letter, particularly in light of the negligent hiring claim against SCC, which asserted that Sanchez-Valdez had not been properly qualified, trained, or supervised by SCC.

¶23 Finally, Rainer failed to act in a reasonably prompt manner in seeking pertinent information after receipt of the police report, which alerted her to Sanchez-Valdez's vision issues. For example, Rainer filed her complaint against SCC and Sanchez-Valdez the day before the statute of limitations expired, which was seventeen months after she received the police report. When she served the complaint several months later, she did not seek expedited disclosure or discovery. Upon exchanging initial

disclosures with SCC in June 2010, seven months after filing the complaint, SCC provided its file relating to Sanchez-Valdez, which prompted Rainer to investigate Dr. Kurbat's medical examination records. She did not depose Sanchez-Valdez until January 2011, and the amended complaint was not filed until September 2011, fifteen months after receipt of SCC's initial disclosure statement. Rainer's actions belie her assertion that she diligently investigated her claims against Swift and the Kurbats.[3]

## II. Accrual of the Statute of Limitations

¶24 In her opening brief, Rainer asserts that Sanchez-Valdez and SCC (along with its counsel) concealed critical evidence, which delayed her discovery of the claims against Swift and the Kurbats, thereby tolling accrual of the statute of limitations. Rainer has waived this argument, however, because she failed to describe any legal theory or cite any authority supporting her suggestion. *See* ARCAP 13(a)(7)(A) (stating that arguments in appellant's opening brief must contain "contentions concerning each issue presented for review, with supporting reasons for each contention and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies").

¶25 Waiver aside, Rainer has not shown how the concealment theory supports her position under these facts. "The wrongful concealment sufficient to toll a statute of limitations requires a positive act by the defendant taken for the purpose of preventing detection of the cause of action." *Ulibarri*, 178 Ariz. at 162 (citing *Cooney v. Phoenix Newspapers, Inc.*, 160 Ariz. 139, 141 (App. 1989); *see also Jackson v. Am. Credit Bureau, Inc.*, 23 Ariz. App. 199 (1975)). Rainer argues SCC concealed Dr. Kurbat's existence and his affiliation with Swift by not disclosing the fact that it complied with the FMCSR and maintained a Driver's Qualification File on Sanchez-Valdez, including his medical examination reports. Rainer asserts SCC and its counsel withheld this information by not responding to her March 20, 2008 letter, but provides no supporting evidence.

¶26 Assuming Sanchez-Valdez's false representation to police was an affirmative act to conceal evidence from Rainer, his misconduct is

---

[3] Rainer cites several cases in support of her assertion that whether a reasonable investigation had been conducted in a particular situation is a jury question. As explained, *supra* ¶ 12, we agree that claim accrual issues are generally decided by a jury; however, that principle does not apply if failing to investigate potential claims is not reasonably justified. *See Walk*, 202 Ariz. at 316, ¶ 23.

not imputed to Swift or the Kurbats. *See Ulibarri*, 178 Ariz. at 162 (positive act *by the defendant*) (emphasis added). Moreover, it was Rainer's failure to follow-up on SCC's offer to discuss Sanchez-Valdez's file, not concealment by SCC, that kept her from obtaining the file. If Rainer had done so, she would have been alerted to the involvement of Dr. Kurbat and Swift.

¶27 Viewed in the light most favorable to Rainer, the record does not reveal any material issue of disputed fact regarding whether she failed to timely conduct a reasonable investigation of her claims against Swift and the Kurbats. Thus, we agree with the trial court's finding that her claims are time-barred.[4]

## CONCLUSION

¶28 Because the trial court did not err in granting summary judgment for Swift and the Kurbats, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[4] Because we conclude that summary judgment was appropriate on statute of limitations' grounds, we need not address Swift's alternative argument that it could not be held vicariously liable for Dr. Kurbat's alleged negligence.